Argued July 22, decided September 21, 1909.

## STATE v. HEMBREE.

[103 Pac. 1008.]

CRIMINAL LAW—EVIDENCE—OTHER OFFENSES.

1. While proof of other offenses having no connection with that charged, is ordinarily inadmissible, the State, to establish intent or motive, may show other crimes committed by accused which are connected with the offense charged.

CRIMINAL LAW—ELEMENTS OF CRIME—MOTIVE.

2. The existence of a motive for the commission of a crime is not indispensable to conviction, though such proof is of great importance in cases depending on circumstantial evidence.

CRIMINAL LAW—EVIDENCE—INFERENCES—INFERENCE ON INFERENCE.

3. Under Section 783, B. & C. Comp., defining inference as a deduction which the reason of the jury makes from the facts proved without any express direction of law, and Section 785, requiring an inference to be founded on a fact legally proved, or on such a deduction from that fact as is warranted by the usual propensities or passions of men, etc., an inference cannot be predicated upon an inference, so that where accused's sexual intercourse with his daughter was not legally proved as a fact, it would not support an inference of motive for the killing of his daughter and wife.

CRIMINAL LAW—EVIDENCE.

4. The presence of semen on a bed sheet cannot be held to be shown by evidence of the existence of a whitish liquid on, or a starchy condition of, the sheet, but the existence of spermatozoa should have been established therein.

CRIMINAL LAW—EVIDENCE.

5. The relationship of father and daughter excludes any presumption of sexual relations between them merely from their intimate association, and a much greater degree of proof would be necessary to justify a criminal inference than if such relationship had not existed.

HOMICIDE—SUFFICIENCY OF EVIDENCE—MOTIVE.

6. In a prosecution for murder by setting fire to accused's house in which his wife and daughter were burned, where the State's theory was that accused had committed incest with his daughter, of which his wife had learned, thus furnishing a motive for the crime, evidence *held* not to establish incest as a fact in evidence.

From Polk: GEORGE H. BURNETT, Judge.

The defendant, A. J. Hembree, was tried and convicted of murder in the first degree, and from the sentence following such conviction, he appeals.        REVERSED.

For appellant there was a brief over the names of *Messrs. McCain & Vinton, Mr. Martin L. Pipes* and *Mr. George A. Pipes,* with oral arguments by *Mr. Martin L. Pipes* and *Mr. James L. McCain.*

For the State there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, *Mr. John H. McNary,* District Attorney, and *Mr. W. H. Cooper,* Deputy District Attorney, with oral arguments by *Mr. McNary* and *Mr. Isaac H. VanWinkle,* Assistant Attorney General.

Opinion by MR. CHIEF JUSTICE MOORE.

The defendant, A. J. Hembree, was convicted of the crime of murder in the first degree alleged to have been committed in Tillamook County, December 28, 1905, by killing his wife, and he appeals from the judgment of death which followed. His counsel contend, *inter alia,* that an error was committed in admitting, over objection and exception, testimony from which the jury were improperly permitted to base an inference on an inference.

Before considering the question presented, it is deemed prudent to state the substance of the material evidence relating to the case as developed at the trial. For some time prior to the alleged homicide the defendant had lived on a farm at Sandlake, in the county named. His family consisted of his wife, their daughter Ora, about eighteen years old, and their sons, Lawson and Roy, then fourteen and twelve years old, respectively. These boys on December 26, 1905, went about 16 miles from home to visit relatives, and three days thereafter, and prior to their return, their father, at 2:45 A. M., was heard breathing very hard as he approached the residence of Mr. Hoyt, who lived a mile and a quarter from his place, and, as he entered the house, he inquired if his wife and daughter had arrived. Upon receiving a negative answer, he stated that his house had burned, and that Mrs. Hembree and Ora were out in the cold, and requested Mr. Hoyt's brother-in-law, James Thompson, who was then visiting him, to go and look for them. When Hembree reached Hoyt's house, he wore only an undershirt,

drawers, old shoes, a hat, and had a burlap hop sack
placed over his shoulders. Complaining of his head,
which was very warm, the defendant was permitted to
repose on a lounge while his temples were bathed with
cold water. After occupying the couch about an hour,
he asserted that the noise caused by preparing the morn-
ing meal disturbed him, whereupon he was allowed to
retire to a bedroom, where he slept until 7 o'clock in the
morning, when he arose, and was given clothing and
food. In the meantime Thompson, having gone to Hem-
bree's farm, found the house wholly consumed, except a
bed of coals about six feet square and three feet high on
the ground in what had been the center of the main
building. Being unable to find Mrs. Hembree or her
daughter, he notified two neighbors of the fire, and they
went to Hembree's farm, arriving at daylight, and found
in the embers two human skeletons, which it is admitted
were the remains of the defendant's wife and daughter.
No vestiges of the heads of either was then to be seen,
but it subsequently appeared that the chimney had fallen
on parts of the remains, so that the bricks had to be
removed in order to gather the bones for interment.
About February 14, 1906, there were found in the ashes
where the skeletons had been 16 natural teeth and one
artificial tooth; the testimony showing that Mrs. Hem-
bree used false teeth. Evidence was admitted, over
objection and exception, relating to the finding in parts
of a stove that had been in the house when it burned of
what is claimed to be bones of a human skull and an arti-
ficial tooth, such alleged discovery having been made 10
and 64 days, respectively, after the fire. No direct evi-
denec was offered tending to establish a criminal agency
on the part of the defendant. The charge against him
was undertaken to be established, however, by the fol-
lowing circumstances: (1) His sons were away from
home when the house was burned; (2) the mass of
embers which was first seen at the fire, it is maintained,

could not have been supplied from the material of which the building was composed; (3) when the skeletons were discovered, no skull bones were seen; (4) the finding in the broken parts of a stove of cranium bones and an artificial tooth. These alleged attendant conditions, and the testimony hereinafter specified from which a motive was inferred, constitute the basis on which the verdict and judgment rest.

The defendant's testimony is to the effect that his sons were permitted to leave home for a few days when their absence would not interfere with the pursuit of their studies at the public school, which had adjourned for the holidays; that in the early morning of December 29, 1905, he was sleeping in his undershirt and drawers in a bedroom over the kitchen in his house, when he awoke and found the chamber filled with smoke; that he immediately called his wife, who was lying at his side, and also aroused his daughter, who was sleeping in another upper bedroom; that Mrs. Hembree and Ora, without putting on other apparel than the nightgowns in which they had been reposing, went with him downstairs, each carrying bed clothing; that, on reaching the lower floor, he discovered under the stairway a fire which he tried to extinguish with a pail of water obtained from the kitchen; that he and his wife tried to carry into the house a tub of water which stood outside, but either the handle broke or Mrs. Hembree fell, for the tub was overturned and the water spilled; that the fire had then made such headway in the cloth and paper lining on the walls that it was found that the house could not be saved, whereupon some of the furniture in the sitting room was cast outside, when Ora suddenly exclaimed, "Mamma, my trunk; my fine clothes!" that, looking up the stairway towards the room in which his daughter's better garments were kept, he said to her: "Don't go up there. It is dangerous"—that he went to the kitchen and removed some provisions and dishes, and thence to the woodshed, where

he threw out a few things; that, when the heat compelled
him to retire, he tried to find his wife and daughter, but
being unable to do so, and thinking they might have gone
to the home of Mr. Hoyt, he started to run in that direc-
tion; that he had previously been ruptured, and as the
truss which he constantly wore had been left with his
outer clothing in the bedroom which he had occupied, his
bowels. escaped from their natural cavity and protruded
through the severed muscles, causing him intense pain,
to relieve which he was obliged to place his hands against
and to press down upon the afflicted parts; that in this
condition he reached the home of Mr. Hoyt, dressed as
hereinbefore mentioned; and that the pain continuing
he was permitted to retire to a bedroom, where, the
hernia having been reduced, his distress ceased, and he
slept unconscious that his wife and daughter had per-
ished in the flames. Furniture, provisions, dishes, cloth-
ing and the upset tub were found near where the walls
of the house had stood. Lawson Hembree, explaining
the finding in the parts of the stove of bones and an arti-
ficial tooth, testified that a few days after the fire he and
his brother Roy went to the farm to care for stock, and
at their father's request they searched in the ashes where
the skeletons had been and found a handful of bones
which had not been buried with the others, which pieces
they threw in a heap to be placed in a grave, and left
them near the broken parts of the sitting room stove.
They thereafter tried to assemble the sections of the
stove so as to make a fire, but after rolling on the ground
the broken parts of the stove, they were found to be so
warped by the heat that they could not be united. Law-
son's testimony is corroborated by that of his brother, so
far as it relates to the unsuccessful attempt to repair
the stove.

The exception first hereinbefore noted relates to the
admission of testimony, which the state maintains estab-
lished the existence of improper relations between the

defendant and his daughter, and furnished the motive
for the commission of the crime with which he was
charged.  The testimony so objected to, and which was
received subject to the promise of the district attorney
properly to connect it, consisted of the sworn declara-
tions of M. S. Larsen, which are to the effect that for
several years prior to the trial herein he had been en-
gaged in conducting a hotel at Tillamook; that he was
acquainted with the defendant, and in her lifetime
also knew his daughter; that she attended a school at
Tillamook about three months, during which time her
father nearly every week brought her to the hotel to
remain over night.  Referring to such a visit made
February 22, 1905, Larsen testified as follows: "He came
into my house after supper time and asked for two rooms.
I told him we would give him one on the third floor, No.
12, and the lady No. 11 on the second floor. * * He said:
'I will go across the street to Mr. Hadley's (meaning a
saloon) and I will come back again.'  He left the lamp
burning. * * The lamp was left burning there, and he
had not been in that room in the morning when I came
there. * * He had been going to her room.  Her door
opened from the wrong side, and he had been there be-
cause of marks of his feet there.  His daughter was in
that room, and he had been going in there through the
door, because he had left his dirt there, all right enough,
and tobacco spit, all right enough."  This witness, having
stated that only one of the beds so assigned was used
that night and that he could not say how many persons
had occupied it, was asked:

"Was there anything to indicate?" and Larsen replied:
"Yes."

"Q. What was it?

"A. Tobacco spit, and one thing and another.

"Q. State to the jury what it was.

"A. It was something on the sheet.  I could not tell
such things some time men leave in bed.  You all know
that."

Larsen further stated upon oath that in June, 1905, Hembree and his daughter again came to the hotel and were informed that no rooms could be given them. The witness was interrogated as follows:

"I will ask you what you finally did?

"He asked me if I would turn his innocent girl on the street on a rainy night. I said, 'No, I will give my own bed up and she can sleep with my wife.' He said, 'You can put her where you please.' My wife said she would rather not do that. She was an old lady. I told him I could find a room for her, but not for him."

The witness having stated that he gave Ora room No. 9, was directed as follows:

"Well, go ahead and state about the defendant's conduct.

"A. I took her to this room and she came back again and went into the parlor and sat down. After they have sat there and talked a little he got up and came into the sitting room and he told me: 'My daughter is ready for bed, and you can take her and I will go out in town and find another room.' He went across the street towards Hadley's saloon, and I took the girl to this room, No. 9. After he left the house, understand, it must have been an hour later and about 11 o'clock he came back again to the house and went down on the other side of the street, down to the corner and stood and looked, and he was walking up and down two or three times.

"Q. Go ahead, Mr. Larsen. You said you saw him walking up and down.

"A. By this time I turned down all the lamps in front and I was sitting inside. I went down on one side of the house, and I came upstairs and saw him standing down below. I went to see what was going on. I wanted to see a litle more. I saw he was watching a window some place. I came upstairs, up to the third floor, got about half way up, and looked right down on the girl, and she lay spread out on the bed. I went upstairs on the third floor, and I looked down and I could see the girl. She was lying on the bed."

The court having adjourned for the day, Larsen's testimony was resumed the next morning, as follows:

"Q. You go ahead where you left off last evening and relate what occurred between the defendant, Hembree, and his daughter that night.

"A. At the time I say that I went back to the lower part?

"Q. What did you see?

"A. Well, I saw him out on the sidewalk, standing there looking up against the window. He was walking along on the other side, and he came up to the front window and put his hand up this way and looked in. There was no light in the house. I turned them down, and went back.

"Q. Went and looked into the front window from the sidewalk?

"A. Yes.

"Q. From the barroom where you sat?

"A. Yes. He came to the other corner at the back part of the house. I came out on the sidewalk, and saw him standing there. Then he came back again, and I came back and sat by the stove and he came up again on the street and looked in again.

"Q. What time was this?

"A. Eleven o'clock in the night. Then I heard him going in at the center door, going upstairs, and he was up two or three stairs at the time, and I stepped out into the hall where he was going upstairs, and I asked him: 'Where are you going?' and he said, 'I am going up to see my daughter.' I said, 'She is not up there.' He said, 'Where is she?' 'Didn't I tell you she was sleeping with my wife?' He said, 'Say, you must not think I am such a fool as that. I know where she is.' I asked him where she is, and he said: 'Room No. 9, right up there.' I said: 'I want you to get out and leave her alone.' He said: 'I have got to tell her something. I want to see her bad.' I said: 'If you have left anything, seal it up and I will pass it to her any time.' He said he could not do that. Then I said, 'You go out.' He said: 'If I can't stay in your house, I must go.' He went across the street to Hadley's saloon. I went back again to my bed, but 20 minutes after 2 he was back again.

"Q. Go ahead, and relate what took place.

"A. He was back again and I happened to hear him go in and stumble on the stairway, and before I could get

up, he had already turned upstairs. I saw something walking up there on the second floor. I walked up there and looked into the girl's room, and he was standing there in the trunk room. I asked him what he wanted, and then I said: 'I want you to go down, or I will throw you down.' I put my foot on his back, and he went downstairs. He landed half ways down and reached in his pocket for something. He turned around again and I sent him downstairs, and he landed on the floor. About 5 o'clock in the morning he was there again. He was lying against the wall alongside of her door. I called him down and he went off. I suppose he had already called the girl, for it was a short time afterward she came down, and they went away together. * *

"Q. You didn't make it plain to me a moment ago about the girl when she was in her room. How was she dressed?

"A. Didn't have anything on.

"Q. What was she doing at the window?

"A. I don't know; leaning up against the building.

"Q. Was the girl doing anything at the window?

"A. Yes.

"Q. What?

"A. Flapping the window curtains.

"Q. Where was he from the window curtain she was flapping?

"A. Standing on the sidewalk. She was lying there this way, with the light burning.

On cross-examination, in referring to the visit made to the hotel in June, 1905, Larsen testified that Hembree and his daughter arrived about 7:30 P. M., and in answer to the inquiry, "After that he went away?" the witness replied: "Yes, took the girl and went away; went to a school doings in town that evening." * *

"Q. When he went away, it was agreed she was to sleep with your wife?

"A. Yes. * *

"Q. Do you know what time it was when Mr. Hembree and his daughter came back to the hotel? * *

"A. Nine o'clock.

"Q. And then what did Mr. Hembree do at 9 a'clock?

"A. They went into the parlor and talked there for 5 or 10 minutes.

"Q. Two of them?

"A. Yes.

"Q. Were you in the parlor?

"A. No.

"Q. Anybody else?

"A. No."

Referring to the defendant's return to the hotel at 11 o'clock that night, Larsen in answer to the question, "Was Mr. Hembree drinking any?" replied, "Yes." On further cross-examination, and alluding to the visit to the hotel on February 22, 1905, after testifying that Hembree went away at 9 o'clock in the evening and two hours thereafter had not returned, when witness retired for the night, Larsen was asked: "Do you know that he came back at all?" He replied: "No."

"Q. Didn't see him come back?

"A. No. * *

"Q. Did you see him next morning?

"A. Yes.

"Q. What hour?

"A. About 5 o'clock. * *

"Q. Where did you see him at 5 o'clock?

"A. Coming down from upstairs.

"Q. Did you say that you saw him lying up against the wall?

"A. He had been lying up against the wall; tobacco spit all around there.

"Q. How do you know?

"A. Tobacco spit and the marks of his arms on the wall.

"Q. Marks of his arms on the wall?

"A. Yes.

"Q. What kind?

"A. Wet and dirty.

"Q. You didn't see him lying up against the wall?

"A. No.

"Q. You saw him coming down?

"A. Yes.

"Q. Drunk?

"A. Not very. He was always drunk.

"Q. Was he pretty full?

"A. Yes. * *

"Q. Raining that night?

"A. It was."

The defendant, as a witness in his own behalf, denied that he had been guilty of any improper conduct toward or with his daughter on February 22, 1905, or at any other time. He admitted, however, that in June of that year, when his daughter remained over night at the hotel, he gave his money to her to prevent him from squandering it for drink, but that, after she had retired, he went to her room and secured several dollars from her with which to purchase liquor. He is corroborated in this particular by the testimony of three men, who severally stated upon oath that at night, some time in the summer of 1905, they taunted Hembree as to his inability to obtain alcoholic beverage in Tillamook, which had been voted "dry" at a local option election; that the defendant, replying that he would show them that he could procure intoxicating drinks, immediately went to Larsen's hotel, which they saw him enter, and, after having been gone but a few minutes, he returned with some money, which he exhibited to them, and that, again leaving them, he soon came back with a bottle of liquor. That the purpose of visiting Ora's room was as indicated seems to find support in Larsen's testimony that, when he saw Hembree on the stairway, the latter said: "I am going up to see my daughter. I have got to tell her something. I want to see her bad"—declarations which the defendant would probably not have publicly made if he had contemplated the commission of a crime.

1. It is argued by defendant's counsel that Larsen's testimony does not prove that any improper relations existed between Hembree and Ora, and that the jury were incorrectly permitted to infer from such sworn declarations that the crime of incest had been committed by the defendant and his daughter; that from such deduc-

tion they were illegally allowed to infer that Mrs. Hembree had obtained knowledge thereof, and based thereon they were further permitted to infer a motive for the commission of the alleged crime. Proof of the commission of other offenses having no connection with the crime for which a defendant is on trial is irrelevant and inadmissible; but in order to establish the intent with which an accused performed a criminal act, or to ascertain a motive for such conduct, the prosecution may show other crimes committed by him, leading to or connected with the offense for which he is being tried: Kerr, Homicide, § 426; Underhill, Crim. Ev. § 90; *State* v. *O'Donnell,* 36 Or. 222 (61 Pac. 892) ; *State* v. *Martin,* 47 Or. 282 (83 Pac. 849).

2. The existence in every case of a motive for the commission of a crime is not indispensable to a conviction therefor: 8 Am. & Eng. Enc. Law (2 ed.), 290; *People* v. *Owens,* 132 Cal. 469 (64 Pac. 770) ; *State* v. *Rathbun,* 74 Conn. 524 (51 Atl. 540) ; though in *People* v. *Wood,* 3 Parker, Cr. R. (N. Y.) 681, 683, in referring to a conviction for the crime of murder, Mr. Justice JOHNSON remarks: "The case being one of circumstantial evidence wholly, proof of the existence of a criminal motive in the mind of the prisoner to commit the act was essential to making out a case against him which would justify a verdict of guilty." In *People* v. *Durrant,* 116 Cal. 179, 208 (48 Pac. 75, 82) it is said: "Where the perpetration of a crime has been brought home to a defendant, the motive for its commission becomes unimportant. Evidence of motive is sometimes of assistance in removing doubt and completing proof which might otherwise be unsatisfactory, and that motive may be shown by positive evidence, or gleaned from the facts and surroundings of the act."

3. Evidence showing that a party charged with a crime had a motive for committing it is not requisite, though such proof is of great importance in cases depending on

circumstantial evidence: *Preston* v. *State,* 8 Tex. App.
30. Thus in *People* v. *Stout,* 4 Parker, Cr. R. (N. Y.)
71, 128, the defendant and his sister were indicted
for the murder of her husband and, the evidence of the
criminal agency being circumstantial, testimony was re-
ceived over exception of an incestuous relation existing
between the accused parties during a few months im-
mediately preceding the homicide, and it was ruled that
no error was thereby committed. In that case the per-
petration of the crime of incest by the accused parties
and the knowledge thereof by the husband were facts
legally established from which the inference of a motive
was deduced. In *People* v. *Bennett,* 49 N. Y. 137, 149,
it was held that an inducement tempting the mind to
commit a crime could not be assumed, but that the fact
from which the incentive was deduced must be estab-
lished; the court saying: "It is in cases of proof by cir-
cumstantial evidence that the motive often becomes not
only material, but controlling, and in such cases the facts
from which it may be inferred must be proved. It can-
not be imagined any more than any other circumstance
in the case." So, too, in *People* v. *Fitzgerald,* 156 N. Y.
253, 258 (50 N. E. 846, 847), it is said: "In attempting
to prove a fact by circumstantial evidence there are cer-
tain rules to be observed that reason and experience
have found essential to the discovery of truth and the
protection of innocence. The circumstances themselves
must be established by direct proof and not left to rest
upon inferences." That an inference may be based on
an inference is maintained by reputable authors (see
Will's Cir. Ev. (Beer's Am. Notes), 18g; Wigmore, Ev.
§ 41). In *Hinshaw* v. *State,* 147 Ind. 334, 363 (47 N. E.
157, 166), in commenting on subsidiary facts tending to
support a judgment of conviction rendered against the
plaintiff in error for the alleged killing of his wife, Mr.
Justice McCABE says: "This process of tallying and con-
firming each circumstance by the others does not infringe

the general rule that one inference cannot be based on another. There is an important exception to that rule, however. A fact in the nature of an inference may itself be taken as the basis of a new inference, whether intermediate or final, provided the first inference has the required basis of a proved fact"—citing in support of the exception Burrill, Cir. Ev. p. 138; Best, Pres. § 187; ·Greenleaf's Ev. § 34. The exception thus referred to is a literal quotation from the first text-book cited, except that the word "again," with which the sentence begins, has been omitted from the opinion. The paragraph from which the excerpt was thus taken concludes with the following statement: "And the right to draw one inference from another has in some instances been denied." The legal principle last quoted finds support in a text-book, the author of which, commenting on several decisions, remarks: "The cases afford many instances of evidence held admissable as affecting the probabilities concerning the principal question. But this proposition finds its limitation in the further proposition that an inference cannot be based on an inference": Gillett, Ind. & Col. Ev. § 51. To the same effect is 3 Enc. Ev. p. 70. Our statute, defining a species of indirect evidence and prescribing when that class is admissable, contains the following provisions: "An inference is a deduction which the reason of the jury makes from facts proved, without an express direction of law to that effect": Section 783, B. & C. Comp. "An inference must be founded (1) on a fact legally proved; and (2) on such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature": Section 785, B. & C. Comp. The law thus set forth was enacted in 1862, at a time when the rule announced by Gillett and as reiterated in the Encyclopedia of Evidence, to which reference has been made, was probably controll-

ing. But, however this may be, the statutory require-
ment that an inference "must be founded on a fact
legally proved" necessarily excludes the more modern
doctrine of predicating an inference on an inference.

4. It will be remembered that in alluding to a visit
made to the hotel February 22, 1905, Larsen testified that
the defendant had been going to his daughter's room.
This emphatic declaration was immediately qualified and
its effect weakened by the sworn statement of the witness
showing that his conclusion is not founded on seeing
Hembree enter her apartment, or observing him therein,
or noticing him depart therefrom; but the decision is
predicated on finding the next morning that the bed
assigned to him had not been disturbed, and that the
lamp which had been lit to illuminate his room the night
before was still burning, and by discovering tobacco spit,
marks of the defendant's feet, and the soiled sheet on
Ora's bed. It will be borne in mind that on cross-exam-
ination Larsen testified that he did not know that Hem-
bree came back to the hotel that night, but at 5 o'clock
the next morning the witness saw him coming down-
stairs, and observed tobacco spit all around and marks
of his arms on the wall, probably evidencing the place
where the defendant, after returning at a late hour from
the saloon, had slept during his inebriation and while
resting against the wall. If by Larsen's reference to
the "dirt" which he asserts Hembree left in his daugh-
ter's room the witness meant to imply that he discovered
semen, such substance will not be presumed from the
appearance of a mere whitish liquid on or a starchy con-
dition of the sheet, but that the assumed pollution con-
tained spermatozoa as its essential constituent should
have been established by competent evidence (Burrill,
Cir. Ev. 137), which apparently was not offered. So,
too, the possibility of the alleged contamination from
any other source than from the defendant should have
been negatived, which was not done.

5. Larsen's direct and cross-examination is to the effect that in June, 1905, Hembree and his daughter having returned from a school entertainment about 9 o'clock at night, the witness took Ora to room No. 9, from which she came to the parlor, where she remained with her father five or ten minutes, no other persons being present. If she possessed a libidinous impulse, of which there is not a particle of evidence in the transcript aside from the implication to be gathered from Larsen's testimony, it would seem improbable that after retiring she flapped the curtains in order to attract her father's attention, when she knew before he left the hotel that room No. 9 had been set apart for her accommodation, and she probably told her father while they were together in the parlor what apartment she was to occupy during the night. It is fairer to infer from her deshabille and the waving of the window shades, as observed by Larsen when he looked into her room, that the disrobing and the vibration were the means taken to mitigate the high degree of temperature, which at that season of the year was reasonably to be expected in this latitude, rather than to assign to her conduct an unchaste desire. The relationship which existed between Hembree and his daughter excludes the presumption of any improper relation with each other from their mere intimate association, and, before an inference of their criminality could have been deduced, a much greater degree of proof was required than if the family tie had not existed.

6. The witness, Larsen, seems to have deduced the inference of incestuous adultery from the circumstances which he related, and on such conclusion the jury were permitted, over objection and exception, to base other inferences, unmindful of the statutory requirement that the basic fact, the illicit intercourse, should have been legally proved before a motive for the commission of the alleged homicide could have been inferred, even to bring the case within the exception noted in *Hinshaw* v. *State,*

147 Ind. 334, 363 (47 N. E. 157, 166). As the fact of incest was not established, Larsen's testimony was not connected, and an error was committed in receiving his sworn statements, in consequence of which the judgment is reversed and a new trial ordered.          REVERSED.

Mr. Justice MCBRIDE, having tried the action wherein the defendant was charged with killing his daughter, took no part herein.