Argued July 1, affirmed October 21, 1924, rehearing denied April 7, 1925.

## STATE *v.* CHARLIE SING.

(229 Pac. 921.)

**Criminal Law—Failure to Order Defendant to Accompany Jury to View Place of Crime not Error.**

1. Failure to order defendant to accompany jury to place of crime is not error, under Section 133, Or. L.

**Criminal Law—Purpose of View is not to Receive or Take Evidence, but to Better Comprehend Evidence.**

2. Purpose of view by jury under Section 133, Or. L., is not to take or receive evidence, but only to enable jury better to comprehend evidence adduced upon trial and apply testimony to issues.

**Criminal Law—Persistent Attempt to Force Incompetent Testimony upon Attention of Jury may Constitute Prejudicial Error.**

3. Persistent attempt to force upon attention of jury incompetent testimony that has been excluded by court may constitute prejudicial error.

**Homicide—That Accused and Deceased Belonged to Rival Chinese Tongs Admissible to Show Motive.**

4. That defendant and deceased belonged to rival Chinese tongs was admissible to show motive.

**Criminal Law—Denial of Motion for New Trial on Ground of Insufficiency of Evidence cannot be Assigned as Error.**

5. Denial of motion for new trial cannot be assigned as error and reviewed upon assignment of insufficiency of evidence to justify verdict.

---

1. View in absence of accused as prejudicial error, see notes in 11 Ann. Cas. 1159; Ann. Cas. 1915B, 568; 42 L. R. A. 368. See, also, 8 R. C. L. 92.

2. See 26 R. C. L. 1017.

4. See 13 R. C. L. 910.

5. See 20 R. C. L. 275.

Homicide—Instructions on Manslaughter not Considered if No Objections Before Verdict.

6.  Where no objection was made and no exception reserved to manslaughter instruction until verdict was received convicting defendant of manslaughter, and acquitting him of murder, such instruction cannot be considered on appeal.

Homicide—Even Slight Proof of Manslaughter Requires Court to Instruct Thereon.

7.  Where evidence adduces even slight proof which tends to reduce homicide from murder to manslaughter, trial court should give defendant benefit of any doubt and instruct upon manslaughter.

Homicide—One Convicted of Manslaughter cannot Complain of Insufficiency of Evidence Where Verdict for Murder Would have Been Warranted.

8.  One convicted of manslaughter cannot complain that there was no evidence of manslaughter where there was evidence that would have warranted verdict of murder, in view of Sections 1551, 1552, Or. L.

Criminal Law—Admission of Document Showing Sale of Pistol, and Exclusion on Failure to Connect Accused With Purchase, Held Without Error.

9.  Where court, over objection of defendant, permitted introduction of document of hardware company showing sale of pistol, on promise of prosecution to connect defendant with transaction, and subsequently, on state's failure to so connect defendant, on defendant's motion excluded evidence and instructed jury not to consider it, there was no error.

Witnesses—Questions Assuming Contrary to Fact That Certain Answers have Been Given to Prior Questions Inadmissible.

10.  Questions assuming that certain answers have been given to prior questions, when such answers have not been given, are inadmissible.

Criminal Law—State is not Compelled to Call Witnesses Whose Names are Indorsed upon Indictment.

11.  State is not required to call as witnesses all persons whose names are indorsed upon indictment as witnesses before grand jury.

Criminal Law—Statement of Prosecuting Counsel in Course of Examining Witnesses Held not Reversible Error.

12.  Where defendant's counsel insisted that witness whose name appeared on indictment should be called, and special prosecutor in obedience to request called witness to stand and only asked her what her name was, then twitted defense with words, "They are afraid to ask you," there was no reversible error.

6.  See 14 R. C. L. 808.
7.  See 13 R. C. L. 933.
9.  See 10 R. C. L. 927.
11.  See 8 R. C. L. 84.
12.  See 2 R. C. L. 242.

**Witnesses—Question not Leading Merely Because It can be Answered "Yes" or "No" "Leading Question."**

13.   Question is not leading where it is not suggestive, though it may be answered by "Yes" or "No," test being whether it suggests answer on material matters by putting words or thought in mouth of witness to be echoed back, under Section 858, Or. L.

**Criminal Law—Reversible Error not Predicated on Allowing Leading Questions in Absence of Abuse of Discretion.**

14.   In absence of palpable abuse of discretion resulting in prejudice, reversible error cannot be predicated upon ruling allowing leading questions.

**Witnesses—Witness may be Impeached by Inconsistent Statements Made at Other Times, but Statements must be Related to Him.**

15.   Witness may be impeached by evidence that he made, at other times, statements inconsistent with his testimony, but statements must first be related to him with circumstances of time, places and persons present, in view of Section 864, Or. L.

**Criminal Law—Prosecution may not Show Defendant's Bad Reputation in First Instance.**

16.   Except so far as character of accused for veracity may be attacked when he is witness, prosecution is not permitted to show defendant's bad reputation in first instance.

**Criminal Law—"Character" and "Reputation" are not Synonymous, but are Used Interchangeably.**

17.   Terms "character" and "reputation" are not synonymous, but are used interchangeably by most courts and law-writers.

**Criminal Law—Instruction as to Character of Defendant Held not Prejudicial.**

18.   Instruction as to right of state to introduce evidence of "bad character" of defendant, though it should have used the word "reputation," *held* not prejudicial to defendant.

**Criminal Law—Duty of Prosecuting Attorney to be Fair to Defendant and Base Argument on Evidence of Record.**

19.   It is solemn duty of prosecuting attorney to be fair to defendant, and to base his argument upon evidence of record.

---

See 11 **C. J.** 289; 16 **C. J.** 580, 816, 827, 846, 866, 886, 891, 893, 894, 904, 1071; 17 **C. J.** 245, 252, 297, 341; 30 **C. J.** 180, 406, 437, 452; 40 **Cyc.** 2423, 2435, 2687, 2719.

From Clatsop:   J. A. EAKIN, Judge.

---

14.   Permitting leading questions as matter within discretion of trial court, see note in 17 **Ann. Cas.** 840. See, also, 28 **R. C. L.** 589.
15.   See 28 **R. C. L.** 633, 636.
16.   See 8 **R. C. L.** 212.
19.   See 22 **R. C. L.** 104.

In Banc.

This is a case of homicide. On June 21, 1922, the defendant, Charlie Sing, also known as Louie Fat, was indicted by the grand jury of Clatsop County, Oregon, charged with the crime of murder in the first degree, by purposely, and of deliberate and premeditated malice, killing one Seid You by shooting him with a pistol. Upon arraignment, defendant entered a plea of not guilty, and, upon trial, was convicted of manslaughter. Thereupon, he interposed a motion for new trial which was overruled. A judgment of conviction was entered against him, from which he appeals, assigning many errors.

AFFIRMED. REHEARING DENIED.

For appellant there was a brief over the names of *Mr. Edward E. Gray, Mr. John F. Logan* and *Messrs. G. C. & A. C. Fulton* with oral arguments by *Mr. G. C. Fulton* and *Mr. Logan.*

For respondent there was a brief over the names of *Mr. J. O. Erickson,* District Attorney, *Messrs. Norblad & Hesse* and *Mr. C. W. Robinson,* with an oral argument by *Mr. Erickson.*

*Messrs. Collier, Collier & Bernard, Amici Curiae.*

BROWN, J.—The defendant herein was a stranger in the vicinity of Astoria, having arrived there from Seattle, Washington, only a short time before the homicide. Seid You, the deceased, had been an inhabitant of Astoria for a number of years. He was a Chinese grocer, engaged in business on the corner of Bond and Sixth Streets, facing Bond. While in his store at about 8 o'clock on the morning of June

10, 1922, he was shot to death. He fell within five feet of the front door and a few minutes after the firing of the fatal shots was found lying on his left side, in a pool of blood, gasping for breath. After the shooting he never spoke. On his body were found five gunshot wounds.

It is the theory of the state that Seid You was assailed by two of his countrymen who shot him down and fled, and that the defendant was one of the two. The defendant admits that Seid You, while in his store, was shot to death by two assailants on the morning of June 10, 1922, but denies that he was one of the participants in the homicide. As stated in his brief:

"The defendant put forth but one defense, and one defense only; namely, that he was not one of the two men who committed the crime."

William Moore, a groceryman engaged in business at a point two blocks from the corner of Sixth and Bond Streets, testified that a few minutes after 8 o'clock A. M. on June 10th he heard some shots; "sounded like three first, and then two." He further testified to the effect that O. D. Wilson, a salesman for a wholesale grocery company, was in his store at the time, and when they heard the shots they got into Wilson's automobile and hurried to the place whence came the pistol reports. They went to the front of the store, which had double doors constructed of wood and glass. The door was locked. Looking in they saw Seid You lying on his left side, in a pool of blood near the door. They forced the door, found the Chinaman in the throes of death, gasping for breath and unable to speak. Later, other witnesses arrived.

According to the testimony of John H. Reith, a dairyman, who shortly before the commission of the crime on the morning of June 10th was delivering milk on his regular route in the City of Astoria at a point in the vicinity of Seid You's store, he saw two Chinamen on the street, one tall and the other short, one of whom was carrying a paper sack. He testified that his attention was attracted to them on account of their movements, and that one of them was the defendant herein.

Oswald Johnson, a youth fifteen years of age, was assisting Reith in the delivery of milk on the morning of the homicide. He testified that at about 8 A. M. on June 10th, while in the vicinity of the Seid You store, he saw two Chinamen, a tall and a short one, one of whom was carrying a paper bag, and identified the defendant as one of the two.

Mildred Ringsted, one of the principal witnesses for the state, testified that at the time of the trial she was, and for eight years prior thereto had been, a saleslady for the Donnerberg jewelry store; that she resided between Fourth and Fifth Streets on Bond Street, Astoria; that she had been acquainted with Seid You, the deceased; that at about the hour of 8 o'clock A. M., on June 10, 1922, while on her way to work, when she reached a described point between Fifth and Sixth, on Bond Street, she saw two men, one tall, the other short, coming down Sixth Street, between Commercial and Bond near the Seid You store and on the same side of the street; that she saw the men step to the front of the store; that the smaller of them held up a paper sack "right against the store door," and that she heard three or four shots fired; that—

"After the little fellow had done his shooting, the tall fellow took his gun from his pocket and fired twice."

She testified that she saw the smaller man throw his gun away; that—

"I told Mr. Entler where, and he found it; * * and the tall one threw his gun in the alley * * back of the store."

Witness testified that after the shooting she walked toward the corner on the opposite side of the street from the scene of the homicide and met George Olson; that—

"I told him that a Chinaman had been killed, so he said, 'Get in the car and we will follow them.' * * We got in the car and followed the Chinaman two blocks up the street."

She testified that as they passed the Chinaman in the machine he looked at them and she saw his face; that he was the tall one,—the defendant on trial, and that she didn't know what became of the shorter man.

William Sjoblem, a laborer, residing at 108 Astor Street, Astoria, and engaged in pile-driving and dock work, testified that about 8 A. M., on June 10, 1922, he was walking uptown; that when he reached a point between Fifth and Sixth Streets he saw two Chinamen, one short and one tall, coming north on Sixth Street near the Seid You store; that the short man had a parcel in his hand; that—

"The smaller fellow, he went up to the door, and the first thing I hear he started to shoot."

Witness testified that the man fired three shots through the door, and that he saw the defendant there at the same time; that—

114 Or.—18

"Why, he [defendant] stood close by him there, and when this small fellow got through shooting, why, it seemed to me like he made kind of a motion to him, so he stepped up and took two more shots. * * Q. This defendant here? A. That is the one. Q. You sure this is the man? A. That's the man. Q. How far were you away from him at that time? A. About 80 feet, I should judge. * * When they were through shooting, why, they turned toward us or where we were standing."

Witness testified that he had a clear view of the defendant's face.

"Q. Was there anybody else around there at the time you saw the shooting? A. Yes, there was Miss Ringsted. * *

"He shot through on the right-hand side as you go in. * * I heard five shots."

He testified that after the shooting the two men walked together a few steps and then separated and ran.

The defendant was arrested on the evening of June 10th, at Warrenton, a few miles from Astoria. When the arresting officers pressed him as to his movements during the day of the 10th he gave conflicting accounts as to his whereabouts on that day and as to where he roomed on the night of the 9th.

1. The defendant charges error because the jury viewed the premises where the deceased was killed, in the absence of the defendant, and likewise asserts error because a second view was had thereafter, at which time the defendant was ordered to accompany the jury.

Our statute provides:

"Whenever, in the opinion of the court, it is proper that the jury should have a view * * of the place in which any material fact occurred, it may

order the jury to be conducted in a body, in the custody of a proper officer, to the place, which shall be shown to them by the judge or by a person appointed by the court for that purpose. While the jury are thus absent, no person, other than the judge or person so appointed, shall speak to them on any subject connected with the trial.'' Or. L., § 133.

2. The purpose of the view, under our statute, is not to take or receive evidence, but only to enable the jury, with the aid of visible objects, better to comprehend the evidence adduced upon the trial and apply the testimony to the issues: *State* v. *Suber,* 89 S. C. 100 (71 S. E. 466); *State* v. *Adams,* 20 Kan. 311; *Sasse* v. *State,* 68 Wis. 530 (32 N. W. 849); *Close* v. *Samm,* 27 Iowa, 503; *Shuler* v. *State,* 105 Ind. 289 (4 N. E. 870, 55 Am. Rep. 211).

In some jurisdictions there is a diversity of opinion concerning the right of the accused to be present at the view of the place where the crime was committed. However, that question is settled in this jurisdiction. The failure of the court to order the defendant to accompany the jury to the place where Seid You was slain does not constitute error: *State* v. *Ah Lee,* 8 Or. 214; *State* v. *Moran,* 15 Or. 276 (14 Pac. 419); *State* v. *Chee Gong,* 17 Or. 635 (21 Pac. 882).

''If the purpose of the view is to obtain evidence, the view is a part of the trial and the presence of the accused is indispensable, even where the statute is silent, as he has a constitutional right to confront the witnesses, to hear the evidence, and to observe the actions of the jury.'' Underhill's Criminal Evidence (3 ed.), § 365.

In *Molalla Elec. Co.* v. *Wheeler,* 79 Or. 478 (154 Pac. 686), it was held by this court that where a

tract of land in litigation was viewed by the court
or jury, a judgment must be rendered, not on the
view had, but on the evidence introduced as ex-
plained by the view.

In the case at bar, there was no dispute as to
the physical facts surrounding the scene of the homi-
cide. Each party contended that the crime of
murder had been committed, and the question for
solution pertains to the participation of the defend-
ant as an actor in the tragedy.

Now, recurring to the assignment of error as it
relates to requiring the defendant to accompany
the jury to the place of the commission of the
homicide: We have read the record carefully, and
it discloses that the defendant strenuously objected
to the viewing of the premises in the absence of the
defendant, but that the objection was made after
the view had been had, and not before. The record
shows that after a statement of the cause to the
trial jury and the jury had viewed the premises,
the state placed one J. H. Entler upon the witness-
stand and commenced his examination. Thereupon,
counsel for the defense interposed the following
objection:

"Mr. Fulton: Well now, if the court please, we
desire at this time to enter our exceptions to the
proceeding just had in which the jury were taken by
the bailiff to the scene where it is claimed that this
crime took place, where the murder took place, and
viewed and inspected the premises, and they did so
in the absence entirely of the defendant—I think
the record ought to show that the defendant was not
with the jury, was sitting here in the courtroom all
the time, was not given an opportunity to be with the
jury, and the jury inspected these premises during—
whilst in the absence of the defendant."

The prosecution, through its special counsel, answered:

"Mr. Norblad: I think the objection is well taken, your Honor. I didn't notice his absence. Mr. Fulton never called anybody's attention to it, and I supposed the court instructed the bailiff to take the defendant with him. I now, therefore, move you that the jury be reconducted to the place, and that the bailiff or the sheriff take the defendant over there, as well.

"Mr. Fulton: They have been there. * *

"Mr. Fulton: And we add to our objection—we object to any further evidence being offered in this case on the ground that the jury were taken to the scene of the alleged crime and inspected it and in charge of the bailiff, all of which was done during the absence of the defendant, during all that time he was in the charge and guard and care of this county, and not permitted to accompany the jury. * *

"The Court: * * My recollection is that the Supreme Court has held that viewing the premises in the absence of the defendant in a felony case is a fatal error, and I will overrule that objection at this time with the privilege of renewing it when I inform myself. * * "

The court instructed the jury to disregard the facts "so far as you can disabuse your minds of them that you may have gathered in your view."

Thereupon, the jury proceeded to view the premises again in the presence of defendant, and without further objection on the part of defendant's counsel.

Much of defendant's brief is directed to what his attorneys term "a persistent attempt of the state and attorneys for the prosecution to force upon the attention of the jury evidence which the court had excluded."

While engaged in making the opening statement to the jury, the special prosecutor stated that the defendant and deceased belonged to rival factions known as tongs; that a state of war existed between the rival tongs and that the defendant was a participant therein, and, during the course of the trial, he offered evidence to that effect. The court sustained all objections in reference to the matter and excluded it from the consideration of the jury.

3, 4. It is true that a persistent attempt to force upon the attention of the jury incompetent testimony that has been excluded by the court may constitute prejudicial error: *State* v. *Barton,* 70 Or. 470 (142 Pac. 348). But, if the defendant had a motive for slaying Seid You, evidence of the existence of such motive was proper.

In an indictment for murder, the fact that the prisoner was a member of the "Molly Maguires," and the character and purposes of that organization, were held competent evidence in order to prove motive for the commission of a murder: *Carroll* v. *Commonwealth,* 84 Pa. 107; *Campbell* v. *Commonwealth,* 84 Pa. 187; *Hester* v. *Commonwealth,* 85 Pa. 139; *McManus* v. *Commonwealth,* 91 Pa. 57. See, also, 1 Michie on Homicide, p. 717.

In the case of the *State* v. *Wong Wen Teung,* 99 Or. 95 (195 Pac. 349), the following testimony on cross-examination of the defendant was admitted over the objection and exception of defendant's counsel:

"Q. Do you belong to the Hop Sing tong? A. Yes, sir. Q. How long have you belonged to the Hop Sing tong? A. About, almost two years. Q. You belonged to it down in San Francisco? A. Yes, sir. Q. When did you come here from San Francisco? A. February 15, 1917. Q. That is after

the American calendar? That was after the tong
war started when you came here, between the Hop
Sing tong and the Suey Sing tong, and the Bing
Kong tong? A. I don't know which and which it
was. At the time I only knew the Suey Sing and
the Hop Sing. It does not relate to the Hop Sing."

This court held that the above was proper cross-
examination of the defendant in a murder trial, and
in its opinion stated:

"The state should not be held to a rigid rule which
would restrict the cross-examination so as to prevent
inquiry as to any matters which would throw light
upon the testimony given in chief and properly con-
nected therewith in any way."

In the above case, as in this, the defense was
that the defendant did not know, and had never
seen, the deceased.

War, as generally used, has reference to armed
contests between different states or nations; but, as
used by the attorney in his question to the witness
and his statement to the court as to what he pro-
posed to prove, the term means armed conflict be-
tween the two Chinese societies.

In the case of *State* v. *Casey,* 108 Or. 386, 418
(213 Pac. 771, 217 Pac. 632), we said, and now hold,
that—

"The existence of a motive for the commission of
a crime by the defendant is not essential to his con-
viction for the crime of murder. However, evidence
of motive in cases depending largely upon circum-
stantial evidence is always of value and is com-
petent: *State* v. *O'Donnell,* 36 Or. 222 (61 Pac.
892); *State* v. *Martin,* 47 Or. 282 (83 Pac. 849, 8 Ann.
Cas. 769); *State* v. *Hembree,* 54 Or. 463 (103 Pac.
1008); *State* v. *Start,* 65 Or. 178 (132 Pac. 512, 46

L. R. A. (N. S.) 266); *State* v. *Wilkins*, 72 Or. 77 (142 Pac. 589)."

So far as the evidence discloses the facts, Seid You was assassinated by two of his countrymen whom he had never wronged, and who were entire strangers to him. In the course of the trial, it became highly important that the jury be informed of, and understand, all the circumstances that would tend to explain the defendant's relation to the homicide, and the impelling motive that actuated his act. He was accused of the premeditated and deliberate malice of killing Seid You. The motive became important.

An eminent author has written:

"Some motive,—temptation, or evil impulse, we may assume, is the source of every crime. * *

"Motive * * helps the other proofs, and it is always competent against the defendant." 2 Bishop's New Criminal Procedure (2 ed.), § 1107.

"Motive, in murder, is the impulse or purpose that induces the murderer to kill his victim." *State* v. *Hyde*, 234 Mo. 200 (136 S. W. 316, Ann. Cas. 1912D, 191).

The prosecution averred, and the defendant admitted, that Seid You had died by violence at the hands of another. The issues that arose were in relation to the following: First, who committed the act which caused the death? Second, of what is he guilty?

The crime was proved by a combination of direct and circumstantial evidence. The fact of the firing into the building was established by the direct testimony of two witnesses. The result of the shooting through the door of the store was proved by circumstantial evidence. Both the prosecution and the de-

fense denounce the act of homicide as the handiwork of assassins.

" * * Deliberation and premeditation, when necessary to constitute murder in the first degree, shall be evidenced by poisoning, lying in wait, or some other proof that the design was formed and matured in cool blood, and not hastily upon the occasion." Or. L., § 1906.

In the case at bar, neither is there proof of lying in wait nor evidence of poisoning. Hence, the state, in order to sustain its charge of first-degree murder, was compelled to prove that the defendant, in cool blood, and not hastily upon the occasion, formed a design to kill the deceased. Therefore, evidence of motive became highly important.

As was said in the case of *Campbell* v. *Commonwealth, supra,* where Campbell was an instrument of the society known as the "Molly Maguires," and the defendant appealed on account of the admission of testimony showing that he was such member and the purposes of the order, the court said:

"The evidence complained of tended to shed a flood of light on these and other matters, which without it would have been dark and almost impenetrable. The circumstances of the case were indeed peculiar and extraordinary, and, without proper explanatory testimony, could not have been fully and fairly comprehended by the jury. As a general rule, every transaction can be best understood when viewed in the light of all the surrounding circumstances; and this was especially true in this case. It was for these purposes that the evidence was admitted, and very properly so, we think. If the labyrinths of crime are not explored, justice will be often defrauded."

5. The defendant assigns as error the overruling of his motion for a new trial, on the ground of insufficiency of the evidence to justify the verdict of manslaughter.

The law governing such a motion is well settled.

"It has been the constant and uninterrupted practice of this court since *State* v. *Bowen,* 1 Or. 271, which was a capital case, to the present time,—with one exception hereafter to be noted,—to hold that a motion to set aside a verdict or for a new trial for insufficiency of the evidence, in either a criminal or a civil case, was addressed to the sound discretion of the trial court, and that its ruling thereon cannot be assigned as error in this court on appeal: *State* v. *Fitzhugh,* 2 Or. 227; *State* v. *Wilson,* 6 Or. 429; *State* v. *McDonald,* 8 Or. 113; *State* v. *Drake,* 11 Or. 396 (4 Pac. 1204); *State* v. *Becker,* 12 Or. 318 (7 Pac. 329); *State* v. *Clements,* 15 Or. 237 (14 Pac. 410); *Hallock* v. *Portland,* 8 Or. 29; *Kearney* v. *Snodgrass,* 12 Or. 311 (7 Pac. 309)." *State* v. *Foot You,* 24 Or. 61, 70 (32 Pac. 1031, 33 Pac. 537).

In the comparatively recent case of *State* v. *Evans,* 98 Or. 214 (192 Pac. 1062, 193 Pac. 927), is a collection of Oregon cases holding the doctrine announced, that the denial of a motion for a new trial cannot be assigned as error and reviewed upon the assignment of the insufficiency of the evidence to justify the verdict.

6. In the case at issue, the court instructed the jury as to the law pertaining to murder in the first and second degrees and voluntary manslaughter. No objection was made and no exception reserved to the manslaughter instruction until a verdict was received and filed in court which convicted the defendant of manslaughter and, according to defendant's contention, acquitted him of murder: *State* v. *Steeves,* 29

Or. 85 (43 Pac. 947). Having reserved no exceptions to the court's instructions, the defendant's objections cannot be reviewed here. See *Kearney* v. *Snodgrass, supra.* ·

7. In a case of homicide, when the evidence adduces even slight proof which tends to reduce the degree of homicide from murder to manslaughter, the trial court should give the defendant the benefit of any doubt that the evidence may suggest and instruct upon manslaughter.

But when there is "no evidence tending to reduce the homicide to manslaughter, it is not incumbent upon the court to charge with reference to the lesser crime." *State* v. *Magers,* 35 Or. 520 (57 Pac. 197).

See, also, *State* v. *Megorden,* 49 Or. 259 (88 Pac. 306); *State* v. *Caseday,* 58 Or. 429 (115 Pac. 287); *State* v. *Clark,* 99 Or. 629 (196 Pac. 360).

8. From the evidence set out above, it will be seen that the charge contained in the indictment is supported by evidence from which the jury could have lawfully convicted the defendant of murder.

At Section 653, Wharton on Homicide (3 ed.), it is said:

"And a verdict for a lower degree of homicide will not be set aside on the ground that the evidence does not make out that degree of the crime in terms as defined by the statute, when it would have supported a finding of a higher degree."

In *Clemmons* v. *State,* 43 Fla. 200 (30 South. 699), the court held that a verdict of murder in a lower degree will be sustained as against a motion for a new trial on the ground that the evidence is not sufficient to support it, notwithstanding it does not make out a case of murder in that degree, but is sufficient to sustain a verdict of a higher degree.

In *Moore* v. *People,* 26 Colo. 213 (57 Pac. 857), the court held that a person convicted of voluntary manslaughter cannot be heard to say that his conviction is erroneous because under the circumstances of the killing he might have been convicted of murder.

It is the opinion of the writer, based upon a careful study of the whole of the evidence of record, that the contention of the defendant that his conviction for manslaughter ought to be annulled because he should have been found guilty of murder, if convicted at all, is wholly without merit. Voluntary manslaughter is a crime within the crime of murder charged by the indictment. Upon an indictment for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment, and guilty of any degree inferior thereto: Or. L., § 1551. Manslaughter is a degree of criminal homicide.

Also: "The defendant may be found guilty of any crime, the commission of which is necessarily included in that with which he is charged in the indictment. * * " Or. L., § 1552.

9. Assignments of error Nos. 9, 10 and 11 arise from the attempt of the prosecution to adduce in evidence a document marked "Plaintiff's Exhibit E."

C. F. McNealy, of the Whiton Hardware Company of Seattle, and in charge of the sporting goods department, including guns and firearms, testified that his department made and kept a record of the numbers of all guns, and the makes and calibers of all firearms and weapons sold by the company. He further testified that a certain revolver, No. 68,448, marked "Plaintiff's Exhibit A," for the purpose of identification, was sold on April 26, 1916, to a

Chinaman by the name of Lock Wing. Over the objection of the defendant, the court, relying upon the promise of the prosecution to connect the defendant with the transaction, admitted in evidence the record of the sale of the revolver, designated "Plaintiff's Exhibit E," which reads as follows:

"Model 1905, caliber— * * length, 6 inches. Description, N. I. & P. * * Received 4–26–16. Sold to Lock Wing. Place, City. Salesman, J. C. Date, 4–26–16. Cash tag; J. C."

The defendant moved to strike the exhibit from the record. The court overruled the motion, and an exception was saved.

At the conclusion of the state's testimony in chief, the defense moved the court to strike "Plaintiff's Exhibit E" from the evidence for the reason that it was received in evidence upon the representation of the special prosecutor that he would follow it up with testimony connecting the defendant with the purchase of the gun, and requested the court to instruct the jury not to take into consideration any of McNealy's testimony relating to the purchase and sale of the revolver. The court granted the motion and instructed the jury not to consider the exhibit as evidence in the case, or to allow it in any way to influence them in arriving at a verdict.

There was no error committed by the court. The court sustained the defendant's motion and instructed the jury as requested by him.

On cross-examination of E. Instennes, a witness on behalf of the prosecution, he was asked:

"Well, will you explain to the jury how your memory is so clear as to what this man said three days before the coroner's inquest, yet you can't remember anything about what you testified at the coroner's inquest?"

The court sustained an objection to the question.

In this connection, counsel urge as error the ruling of the court in sustaining an objection to the following question:

"Q. Now, after deceiving this man (defendant) as you say, you then took him down to Hammond and you interrogated him, as you have heretofore testified?"

The objection was sustained to that portion of the question wherein it assumed that the witness had deceived the defendant.

10. Questions assuming that certain answers have been given to prior questions when such answers have not been given, are inadmissible: Underhill's Criminal Evidence (3 ed.), § 342.

A general rule pertaining to the examining of witnesses in a criminal case is thus stated:

"The manner, mode, scope and extent of the examination of witnesses, together with the character and the form of the questions, and the order of introducing the testimony, is a matter largely in the discretion of the trial court, subject to a few fixed rules flexibly administered; and the ruling of the court will not be disturbed unless such discretion has been abused." Underhill's Criminal Evidence (3 ed.), § 340.

One of the assignments refers to Mrs. B. C. Carrington, whose name appears upon the indictment as a witness before the grand jury, and who, having been subpoenaed by the prosecution, was in attendance as a witness at the trial. After the state had finished its case other than the examination of the witness Sjoblam who was taken ill during his examination, the court instructed the defendant to proceed with his case. Thereupon, the following colloquy

between counsel appears in reference to Mrs. Carrington:

"Mr. Fulton: You have another witness here that is on the indictment, Mrs. Carrington.

"Mr. Norblad: The lady is here. We have no questions to ask her but we have produced her at the suggestion of Mr. Logan. She is here. * *

"Mr. Fulton: So, if you have any further testimony—I was only referring to that—you have her here on the indictment and didn't call her.

"Mr. Norblad: We have no questions to ask her at all. * *

"Mr. Fulton: Then we insist that the state call her.

"Mr. Logan: What is that,—

"Mr. Norblad: I asked the reporter if he had my statement that Mrs. Carrington is here and that we have produced her in court. We will do that—just a moment—Mrs. Carrington (calling her).

"Mr. Norblad: You are Mrs. B. C. Carrington?

"A. Yes, sir.

"Mr. Norblad: That is all.

"Mr. Logan: That is all you have?

"Mr. Norblad: That is all, Mrs. Carrington. They are afraid to ask you. * *

"Mr. Fulton: We desire to predicate prejudicial error upon the act of the special prosecutor in bringing this witness on in this way and asking her that, and stating what the effect of her testimony would be. * *

"The Court: I don't see that there is anything I can do in the matter."

11. The state was not compelled to call Mrs. Carrington. In this jurisdiction the prosecution is not required to call as witnesses in the trial all persons whose names are indorsed upon the indictment as witnesses before the grand jury.

12. In the instant case, counsel for the defense insisted that Mrs. Carrington be called. The special

prosecutor, in obedience to the request, called the witness to the stand. He asked her one question, then twitted the defense with the words: "They (counsel for defendant) are afraid to ask you."

13. We see no occasion for an observation of that kind on the part of the special prosecutor. However, the court made no ruling thereon, none was requested, and, while it were better had the statement not been made, this case should not be reversed and sent back for new trial on that account, especially in view of the fact that the defendant called the witness on his behalf and that she gave material testimony in his favor.

John H. Reith was asked the following questions:

"Q. I will ask you if you had a good look at the face of this defendant at that time?

"A. Yes, sir.

"Q. How many times did you have a good look at the face of the defendant?"

"It is not usually allowable, on the direct examination, to ask leading questions, i. e., questions which, by their form or character, 'suggest to the witness the answer desired'; as, for example, questions which are a statement of fact, and suggest that the witness is to deny or affirm its truth by answering 'yes' or 'no.' A question is not leading where it is not suggestive, although it may be answered by 'yes' or 'no.' The test of a leading question is whether it suggest the answer on material matters, as it were, by putting the words or thought in the mouth of the witness to be echoed back." Underhill's Criminal Evidence (3 ed.), § 342.

See, also, Oregon Laws, Section 858.

14. In the case of *State* v. *Casey,* 108 Or. 386 (213 Pac. 771, 217 Pac. 632), we quoted the following excerpt with approval:

"And in the absence of a palpable abuse of discretion resulting in prejudice to the complaining party, reversible error cannot be predicated upon a ruling of the trial court as to allowing leading questions." 40 Cyc. 2429, and authorities there cited.

15. Error is assigned in the matter of the impeachment of certain witnesses.

A witness may be impeached by evidence that he made, at other times, statements inconsistent with his testimony given upon the trial.

"But before this can be done, the statements must be related to him, with the circumstances of times, places, and persons present." Or. L., § 864.

The purpose of requiring this foundation for impeachment is to enable the witness to refresh his memory in respect to the matter called to his attention: *Oldenburg* v. *Oregon Sugar Co.,* 39 Or. 564 (65 Pac. 869); Jones on Evidence, § 846.

Counsel for defense claim that a difference exists between certain impeaching questions and the impeaching evidence. We have read the record and find no material variance between the two statements. The attention of the witness was called to the time and place and circumstances.

It is said in Jones' Commentaries on Evidence, Section 846:

"Although the attention of the witness should be called to the time of the alleged statement, exact precision in this regard is not necessary. It suffices if there is reasonable certainty, or if it is clear that the attention of the witness is called to the conversation in such manner that it is identified by him. * * On the same principle, if the question designates the person or the place with reasonable certainty, it is sufficient. * * The object of these

114 Or.—19

requirements is to give the witness proposed to be impeached by showing statements out of court contrary to what he has testified at the trial a fair opportunity to recollect and explain his former statements if he made any. While it is usual and important, whenever practicable, to give the exact terms of the proposed contradictory statement, it is not a fatal objection to the testimony if the variance between the statement as set forth in the question and as given in the answer is not such as to make the two statements substantially different.''

In answer to the statement of counsel for defendant that the defendant was a man of good character, the special prosecutor said:

''A man's character is not in evidence until he puts it in himself, and the state can't do so in the first instance.''

Mr. Fulton stated:

''That is not a matter that can be argued to the jury. * * I would like to have the court instruct the jury now that is a matter that the state has no right to argue.

''The Court: Gentlemen, I will instruct you that the question of the state's power to introduce evidence of bad character of the defendant cannot be exercised until the defendant puts his own character into evidence, in issue, is a matter that you have no right to consider,—as a matter of law, it is not a matter that could be argued against the defendant, and you will not consider that or allow it to influence you in any way in arriving at a verdict in the case.''

Thereupon defendant saved an exception.

16. It is a rule of law so firmly established that it should need no citation of authority that, except so far as the character of the accused for veracity may be attacked when he is a witness, the prosecu-

tion is not permitted to show the defendant's bad reputation in the first instance: Underhill's Criminal Evidence (3 ed.), § 137.

17, 18. The defendant says that character and reputation are not synonymous terms.

Strictly speaking, the terms "character" and "reputation" are not synonymous, but they are used interchangeably by most courts and law-writers.

> " 'Character,' in the sense in which the term is used in jurisprudence, means the estimate attached to the individual by the community, not the real qualities of the individual, as conceived by the witness. In other words, it is not what the individual in question really is, but what he is held to be by the society in which he moves." 3 Ency. of Ev., p. 3, note.
>
> "The man's character must be true; his reputation may be most false." Ibid., p. 3, note.
>
> "Where the character or reputation of the accused is not an element of the crime charged, the prosecution cannot put it in issue by offering evidence thereof. Nor can it do so in the first instance, by cross-examining the defendant's witnesses as to his character or reputation." 3 Ency. of Ev., pp. 12, 13.

While the instruction may not be faultless, it was not prejudicial to defendant and did not constitute error.

There are many objections of record involving the arguments of the special prosecutor.

19. The court sustained all proper objections and instructed the jury in reference thereto. It is the solemn duty of a district attorney or special prosecutor to be fair to the defendant and to base his argument upon the evidence of record. We have considered the argument in the light of the testimony

and are of the opinion that the defendant was not prejudiced thereby.

We have also considered the following authorities as being peculiarly in point:

In the case of *State* v. *Anderson,* 10 Or. 448, a capital case, the court held:

"Improper comments of counsel, either in a civil or criminal case, will not of themselves justify a reversal of judgment under our system. They must be connected upon the record with error of the court, to produce such a result. And as no such error is shown here, the alleged exception cannot be sustained."

In the case of *State* v. *Abrams,* 11 Or. 169 (8 Pac. 327), the court said:

"Several objections were made and exceptions saved at the trial by appellant's counsel on the ground of remarks made by counsel for the prosecution to the jury upon matters not in evidence. Some of these remarks attributed to Mr. Dorris were undoubtedly improper and can hardly be condemned with too much severity. But, however reprehensible, there is one insuperable obstacle to their being considered here as ground for reversal. They involve no error of the court below. We have announced this principle before: *State* v. *Anderson,* 10 Or. 448."

As said in *State* v. *McAvoy,* 57 Or. 1 (109 Pac. 763):

"If a party desires to raise a question in the appellate court upon an error occurring during the trial, he must have made his objection at the time the error occurred and obtain a ruling of the court thereon, and if adverse to him he must save an exception: *Kearney* v. *Snodgrass,* 12 Or. 311 (7 Pac. 309); *State* v. *Foot You,* 24 Or. 61 (32 Pac. 1031, 33 Pac. 537); *Crossen* v. *Grandy,* 42 Or. 282 (70 Pac.

906). And this must be done in the manner prescribed in said Section 170, as amended.''

We have considered all assignments of error presented by the record. The defendant's legal rights have been maintained throughout the course of the trial. He has been skillfully defended by able counsel To reverse this case would tend to defeat, not to establish, justice.

This case is affirmed.

AFFIRMED. REHEARING DENIED.

PIPES, J., took no part in this decision.