Argued April 3, reversed May 19, 1914.

# LINTNER v. WILES.*

(141 Pac. 871.)

**Master and Servant—Injuries to Third Persons—Acts of Independent Contractor.**

1. A contractor is not liable for injuries resulting from negligence of an independent subcontractor in leaving dynamite caps used in the work in a place where they were found by the infant plaintiff and exploded by him.

[As to privity necessary to sustain a recovery for negligence, see notes in 42 Am. Rep. 315; 100 Am. St. Rep. 192.]

*For the general rule as to absence of liability of employer for torts of independent contractor, see note in 65 L. R. A. 620.
          REPORTER.

Appeal and Error—Prejudice from Error—Presumption.

2. Where error affirmatively appears, it will be presumed that prejudice resulted, unless the contrary is manifest from an inspection of the record.

Witnesses — Examination — Refreshing Memory — Admissibility of Writing.

3. Under Section 859, L. O. L., providing that a witness may refresh his memory by anything written by himself or under his direction when the fact occurred, or immediately thereafter, or when the fact was fresh in his memory, a memorandum made by a physician, a partner of witness, not under the direction of witness, and where witness had no recollection of the incident noted, was not admissible in evidence.

> [As to when witness may refer to memoranda to refresh memory, see note in 98 Am. Dec. 619.]

Evidence—Presumptions—"Inference" Based on Inference.

4. Under Section 794, L. O. L., defining an "inference" as a deduction which the reason of the jury makes from the facts proved, and Section 796, providing that an inference must be founded on a fact legally proved, testimony that it was the custom to break hard rocks with powder rather than with a sledge, on which it was sought to base an inference that it was essential to use blasting powder, and on that deduction another inference that dynamite caps and fuses by which plaintiff was injured were stored in the place they were found by defendant's servants, was inadmissible.

From Multnomah: HENRY E. McGINN, Judge.

Department 1.  Statement by MR. JUSTICE MOORE.

This is an action by Paul Lintner, a minor, by G. V. Lintner, his father and guardian, *ad litem,* against Elwood Wiles to recover damages for a personal injury, alleged to have been caused by the defendant's negligence in leaving in an open space near a public street detonating caps, whereby the plaintiff, who at the time of the injury was nine years old, finding the cartridges, lost his right eye in exploding one of them.  From a judgment in plaintiff's favor for $5,000 the defendant appeals.  Reversed, and new trial granted.                     REVERSED.

For appellant there was a brief over the names of *Mr. Lawrence A. McNary, Mr. R. A. Imlay* and *Messrs.*

*Fulton & Bowerman,* with an oral argument by *Mr. McNary.*

For respondent there was a brief over the name of *Messrs. Corliss & Skulason,* with an oral argument by *Mr. Guy C. H. Corliss.*

Mr. Justice Moore delivered the opinion of the court.

It appears from a transcript of the testimony, which is attached to the bill of exceptions, that pursuant to the terms of a contract with the proprietors of an addition to the City of Portland, known as Beaumont, the defendant caused to be removed from the tract all the stumps and also graded, paved and otherwise improved the streets laid out on the premises. The stumps were extracted by blasting powder, to explode which sticks of dynamite were used. A detonating cap, consisting of a small copper cartridge partially filled with fulminate and having inserted in the open end a piece of fuse, would be imbedded in the end of a stick of dynamite, and such stick thrust into the blasting powder placed beneath the stump. By applying a lighted match to the outer end of the fuse the burning powder in the igniting tube coming in contact with the contents of the caps caused it forcibly to burst, thereby discharging the dynamite, which in turn exploded the powder, blowing out the stump. In preparing the streets for grading it was also necessary in places to use blasting material in the manner indicated in order to remove rock. All the stumps were taken out in May, 1911, the foundation for the streets and the grading thereof were finished in the following September, and the paving and all the other work under the contract fully completed October 12th of that year. Parts of the clearing and grading were sublet by the defendant to two independent contractors, who em-

ployed the same means to blow out stumps and to re-move rocks from parts of the streets. A rock-crusher, used by the defendant in preparing basaltic rock with which to pave the streets, was installed by him in a path about 60 feet from a street from which a private way extended to a camp maintained by him for his em-ployees when the work was in progress. The testimony of the defendant's witnesses, though disputed, also tended to show that at the same time other persons were clearing land in the immediate vicinity by the use of blasting powder. The plaintiff on October 29, 1912, 1 year and 17 days after the work was fully completed, found in a small cavity in the earth beneath or very near the rock-crusher a wooden box, having sawdust therein, in which were stored a coil of fuse and a small tin box containing about 25 dynamite caps. Believing that these copper shells were loaded for the purpose of killing gophers he placed one of the caps on a rock and hurled a stone at the cartridge, exploding it and causing the injury set forth in the complaint.

It appears from the evidence that the wooden box containing the dynamite caps and the fuse had written thereon the defendant's name. Not much importance, however, can be attached to this circumstance, for John Hartong, the superintendent in charge of the work, testified that several hundred similar empty boxes might have been found scattered over the ground where the work had been performed.

1. Referring to the testimony hereinbefore adverted to, the jury were instructed as follows:

"So, then, if you should determine these explosives were put there by a subcontractor, by one who would ordinarily be a subcontractor, ask yourselves this question: Was that work which was intrusted to him, of the custody of these dynamite caps, such work as if done by that subcontractor with care, the care of

70 Or.—23

the ordinarily prudent man, would not probably have been dangerous to the property or person of another? If you find that this work could have been done by the subcontractor, who had all the other prerequisites I have mentioned to you in defining what a subcontractor was, if you find that by the exercise of reasonable care upon the part of the subcontractor, he could have kept those dynamite caps so they would not have been dangerous and the work which he was doing there was not unreasonably or inherently dangerous, then in that event Mr. Wiles would not be responsible. But, if you should find that, no matter how much care was taken by the independent, or the subcontractor— no matter how much care was taken in the prosecution of the work—it was inherently dangerous, and could not have been done without injury to person or property of another, in that case Mr. Wiles could not shift the responsibility from himself to his independent or subcontractor, but he must answer for the act of the subcontractor or independent contractor the same as though he were his own agent or employee.''

An exception having been taken to this part of the charge, it is contended by defendant's counsel that an error was committed in giving it. The rule is quite general that one person is not ordinarily liable for an injury caused by the negligence of another unless the relation of master and servant exists between them: 16 Am. & Eng. Ency. of Law (2 ed.), 192; *City of Logansport* v. *Dick,* 70 Ind. 65 (36 Am. Rep. 166, 174). From this legal principle it follows that where an injury results from the carelessness of a competent independent contractor, the person subletting the work is not ordinarily liable for the consequences of the wrong inflicted. To this rule there are two well-recognized exceptions: (1) Where the work engaged to be done will, however skillfully performed, be necessarily dangerous; and (2) where the law imposes upon the employer the duty to keep the works in a safe

condition: *McAllister* v. *City of Albany,* 18 Or. 426
(23 Pac. 845); *Mayor etc.* v. *McCary,* 84 Ala. 469 (4
South. 630). Thus if in the execution of the terms
of the agreement by either of the subcontractors herein
a missile hurled by a blast had hit and hurt a person,
or had struck and injured property, the defendant
would probably have been liable for the resulting dam-
ages, because the work when performed in the manner
contemplated was inherently dangerous, and hence he
could not escape responsibility, by subletting the work
or any part of it requiring blasting to another: *Joliet* v.
*Harwood,* 86 Ill. 110 (29 Am. Rep. 17); *Logansport* v.
*Dick,* 70 Ind. 65 (36 Am. Rep. 166); *McNamee* v. *Hunt,*
87 Fed. 300 (30 C. C. A. 653). So, too, as the law
imposes the duty on a municipal corporation to main-
tain in safe condition a street, and obstruction of
which constitutes a nuisance, an injury resulting from
a failure to guard or to maintain a light at the inter-
ruption of the highway will render the corporation
liable though the work was done by an independent
contractor: *McAllister* v. *City of Albany,* 18 Or. 426
(33 Pac. 845); *Ackles* v. *Pacific Bridge Co.,* 66 Or. 110
(133 Pac. 781); *Robbins* v. *Chicago City,* 4 Wall. 657
(18 L. Ed. 427); *Storrs* v. *City of Utica,* 17 N. Y. 104
(72 Am. Dec. 437).

The first exception is not recognized, however, in
some of the states of the Union: 12 Am. & Eng. Ency.
of Law (2 ed.), 512. Thus in *McCafferty* v. *Spuyten
Duyvil etc. R. R. Co.,* 61 N. Y. 178 (19 Am. Rep. 267),
a railroad company let by contract the work of con-
structing its entire road. The contractor sublet a part
of the work to a subcontractor, through the negligence
of whose servants in performing the terms of the
agreement rocks were thrown by a blast upon plain-
tiff's property, injuring it, and it was held that the
railroad company was not liable therefor. To the

same effect, see, also, *Tibbetts* v. *Knox & L. R. Co.*, 62 Me. 437; *Edmundson* v. *Pittsburg, McK. & Y. Co.*, 111 Pa. 316 (2 Atl. 404).

In *Hole* v. *Sittingbourne etc. R. Co.*, 6 Hurl. & N. 488, the defendant, having been authorized to construct a bridge across a navigable river by an act of parliament which provided that it should not be lawful to detain any vessel navigating the stream for a longer time than sufficient to enable carriages, animals and passengers ready to traverse, to cross the bridge and for opening it to admit such vessels, sublet the contract to complete the work. The plaintiff, having two vessels loaded with goods and merchandise, undertook to ascend the river, but, being prevented from doing so by reason of the bridge obstructing a passage, brought an action for the damages sustained, and it was held that the railway company was liable therefor. In deciding that case, POLLOCK, C. B., said:

"Where the act complained of is purely collateral, and arises incidentally in the course of the performance of the work, the employer is not liable, because he never authorized that act. * * But when the contractor is employed to do a particular act, the doing of which produces mischief, another doctrine applies."

In that case the act complained of was not collateral, but direct, consisting of an obstruction of a navigable river by the construction of a bridge, which amounted to a nuisance. What was there said respecting a collateral act was not involved. The *dictum* thus promulgated, respecting the performance by an independent contractor of an act purely collateral, and arising incidentally in the course of the execution of the work, has frequently been reasserted by the courts of this country: *Robbins* v. *City of Chicago*, 4 Wall. 657 (18 L. Ed. 427); *Water Co.* v. *Ware*, 16 Wall. 567 (21 L. Ed. 485). In these cases the injurious acts

complained of were direct, so that the references to the principle adverted to by the Chief BARON were extrajudicial. The question involved in these cases was injury resulting from obstruction of highways. An examination of many of the decisions collated in Rose's Notes of the United States Reports as citations of the cases last noted with respect to the doctrine referred to also shows that no collateral act was involved.

Upon principle, however, it must necessarily be true in the performance by an independent contractor of a purely collateral act in a negligent manner, whereby a person sustains injury which could not reasonably have been anticipated as a direct and probable consequence of an execution of the work contracted for, neither the person subletting the contract nor the party for whose benefit the work was done is liable for the resulting damages. Assuming that the dynamite caps were carelessly placed in a cavity of the earth beneath the rock-crusher by a servant of one of the independent contractors, the defendant in subletting the contract to him could not reasonably have foreseen that, in the performance of the work of removing the stumps or of grading streets by blasting, dangerous fulminating cartridges would have been left where inquisitive children could have found them. If the dynamite caps were put by a servant of an independent contractor in the place where they were found, such negligent deposit of them, though a collateral act, did not evidently arise even incidentally in the course of a performance of the work which was so sublet, for the stumps thus required to be extracted and the streets to be graded were not situate near the rock-crusher.

2. It is believed that the part of the charge under consideration in respect to the deposit of the dynamite caps by an employee of an independent contractor

under or near the rock-crusher, if the jury should so determine, was erroneous. Where error affirmatively appears, it will be presumed that prejudice resulted unless the contrary is manifest from an inspection of the record of the cause which is not apparent herein: *Du Bois* v. *Perkins,* 21 Or. 189 (27 Pac. 1044); *Nickum* v. *Gaston,* 24 Or. 380 (33 Pac. 671, 35 Pac. 31); *Carney* v. *Duniway,* 35 Or. 131 (57 Pac. 192, 58 Pac. 105); *Durkee* v. *Carr,* 38 Or. 189 (63 Pac. 117); *Carter* v. *Wakeman,* 45 Or. 427 (78 Pac. 1); *State* v. *Goodager,* 56 Or. 198 (106 Pac. 638, 108 Pac. 185).

In view of the conclusion thus reached it is believed essential to consider other alleged errors that have been assigned.

3. At the trial Dr. G. H. Ostrander, a specialist, as plaintiff's witness, testified that he was a partner of Dr. Wood, who then was absent from the state; that it was the custom of the witness to assist his associate in the practice of surgery, and that he probably aided in the removal of plaintiff's eye, but he did not remember of having done so, nor did he know that his partner had performed the operation. Producing a book, Dr. Ostrander stated upon oath that a part of the entry therein was in the handwriting of Dr. Wood, saying:

"This record was made October 31, 1912. Paul Lintner, father's initials C. V., resides at 522 East 41st, north, nine years old. Case was referred to Dr. Wood by Dr. Cronell."

Over objection and exception the record was received in evidence and reads:

"Two days ago was struck in the right eye by a piece of percussion cap which cut through the cornea, the iris and the lens; used atropine to dilate pupil; a piece of copper or stone in the eye. November 1st, the right eye enucleated."

It is contended by defendant's counsel that in permitting such memorandum to be received in evidence an error was committed. The memorandum was not written by the witness who produced it, nor was the entry made under his direction, and, as he had no recollection of the incident noted in the book, the record was inadmissible in evidence: Section 859, L. O. L.; *Manchester Assur. Co.* v. *O. R. & N. Co.*, 46 Or. 166 (79 Pac. 60, 114 Am. St. Rep. 863, 69 L. R. A. 475).

4. John Hartong, the defendant's superintendent, as his witness testified on cross-examination that the rock which was passed through the crusher, in order to be placed on the surface of the streets, was basaltic and obtained from the top of the ground where the work was performed; that the stones were loaded by hand upon dump wagons and hauled to the crusher, and when they were too large to be crushed they were first shattered by a heavy sledge, saying, "None were broken otherwise than in that way." He was then asked by plaintiff's counsel:

"I suppose they could not have been broken up with this dynamite?"

The witness replied: "Absolutely no. We used no powder in connection with the rock that I know of."
\* \*

"Q. Have you had special experience in blasting stone?

"A. I have had a great deal of experience in railroad work as engineer in charge of the work where dynamite was used.

"Q. Can you break a niggerhead with dynamite?

"A. It is pretty hard to do it.

"Q. Is there a term used by you men 'bulldozing' a rock?

"A. Yes, sir; but that is pretty hard to do with a niggerhead. You can do it with a flat rock.

"Q. Then you can't bulldoze a niggerhead?

"A. I never tried it. It would be a pretty hard proposition. I never seen it done. I have seen it frequently done on large flat rocks taken out with a steam shovel, too much to handle, too large to handle."

N. D. Smith, an employer of the defendant, as his witness testified on direct examination that some of the rock used in the crusher was secured in the immediate vicinity, and, was asked, "What was it, loose rock?" He answered: "Yes, sir, loose rock—rock we found on the surface of the ground."

"Q. Did you use any powder on that?
"A. No; none at all."

G. V. Lintner, for the plaintiff, further testified that as a civil engineer he had charge of about 30 miles of rock, and was asked "What is a niggerhead?" He replied:

"Well, it is a rock that is partially round; that is, there are no corners on it, and it is generally granite, or flint or very hard basalt.
"Q. Now, it has been claimed here that they were using niggerheads in that crusher in question, and it is claimed that when they got rocks too large to go into the crusher they split them with a sledge. Have you had any experience in breaking up niggerheads?
"A. Yes, sir.
"Q. What would you say about that testimony?
"A. The experience I have had I would have to say that it would be almost entirely necessary to use powder. It is impossible to break them with a hammer."

The witness, detailing the manner of crushing such rock with powder, was asked:

"Is it as expensive as breaking it with a sledge?" and answered, "No."

"Q. State whether that is entirely resorted to in breaking up niggerheals and rocks of that kind.
"A. It is; yes, absolutely."

After the last question had been answered, an objection was interposed to the inquiry on the ground that it was incompetent, irrelevant and immaterial, which objection was overruled and an exception allowed. No motion was made, however, to strike out the answer.

C. W. Craig, a contractor, as plaintiff's witness, having testified as to the manner of "bulldozing" rocks, was asked.

"Do you know what the general custom is among contractors in crushing hard rock—whether the custom is to break them up with a sledge or to break them up with powder?"

This question was objected to by defendant's counsel on the ground that it was incompetent, irrelevant and immaterial. The objection was overruled, and an exception allowed, whereupon the witness replied in effect that "bulldozing" was used to break such rocks rather than splitting them with a hammer.

Without any evidence on the subject, and contrary to the evidence given by the defendant's witnesses, an inference was sought to be deduced by the testimony so objected to that because some of the pieces of basaltic were large and hard, it was essential that they should be broken by blasting powder before their particles could be reduced to the proper size to be crushed in the machine used for that purpose. Based upon that deduction another inference was attempted to be derived that since dynamite caps and fuse were necessary to be employed in breaking hard rocks, the defendant's servants must have stored the blasting material where it was found by the plaintiff. At the trial herein no direct testimony was given tending to show that either the defendant or his subcontractors, or any of their employees, placed the dynamite caps beneath or near the rock-crusher. Such fact, however,

was undertaken to be established by circumstantial evidence, whereby the testimony respecting the manner of ''bulldozing'' rocks was received over objection and exception.

An inference is a deduction which the reason of the jury makes from the facts proved: Section 794, L. O. L. An inference must be founded on a fact legally proved: Section 796, L. O. L. The restrictive clause last mentioned necessarily excludes the legal principle prevailing in some states of predicating an inference upon an inference: *State* v. *Hembree,* 54 Or. 463 (103 Pac. 1008); *State* v. *Lem Woon,* 57 Or. 482 (107 Pac. 974, 112 Pac. 427).

· If such method of attempting to establish the existence of a fact could be legally resorted to, it might have been possible for the defendant to obtain witnesses who could have testified that dynamite caps and fuse were occasionally employed by violators of the law with which to kill fish by explosions in shallow water; that since lakes and streams of that kind may have been found in the vicinity, therefore, it might reasonably have been inferred that the caps and fuse had been stored under the rock-crusher for that purpose by persons with whom the defendant had no contractual relations. Conceding that an inference may be predicated upon an inference, deductions of that kind might be extended indefinitely. Such species of evidence, though seemingly linked by a chain of logical circumstances, would compel the jury to grope in a maze of possibilities without any certainty of ever discovering the truth. The mere statement of the supposed result would seem to demonstrate that under a statute like ours such method of proof is improper. But, however this may be, it is believed that the testimony so objected to is clearly inadmissible.

It follows that the judgment is reversed and a new trial ordered.                              REVERSED.

MR. JUSTICE EAKIN, MR. JUSTICE BURNETT and MR. JUSTICE RAMSEY concur.   MR. CHIEF JUSTICE McBRIDE not sitting.

———————

Appeal dismissed without an opinion April 28, 1914.
Rehearing denied May 19, 1914.