Argued January 31; reversed February 15; rehearing denied
March 28, 1939

# McKAY *v.* STATE INDUSTRIAL ACCIDENT COMMISSION

(87 P. (2d) 202)

Department 2.

*Oliver Crowther*, Assistant Attorney General (I. H. Van Winkle, Attorney General, and Victor R. Griggs, Assistant Attorney General, on the brief), for appellant.

*T. Walter Gillard*, of Portland (Wm. P. Lord and A. F. Knight, both of Portland, on the brief), for respondent.

LUSK, J. The defendant, State Industrial Accident Commission, has appealed from a judgment pursuant to the verdict of a jury awarding compensation for the death of her husband to the plaintiff, Agnes Mae McKay.

Defendant assigns as error the rulings of the court below denying its motions for an order of involuntary nonsuit and a directed verdict, both based on the insufficiency of the evidence.

The decedent, Hosea Pratt McKay, at the time of his death on December 28, 1935, was employed as an electrician by Columbia Construction Company, a corporation, which was doing construction work on the Bonneville Dam Project at Bonneville, Oregon. Both employer and employee were subject to the Workmen's Compensation Law.

On the afternoon of December 28, 1935, the decedent, in the line of his duty, was engaged with another employee, George T. Carr, in an endeavor to locate a short circuit in the signal system by which the opera-

tion of the conveyers and other machinery was controlled. For this purpose they were talking to each other by telephone over the signal line. They were about 500 feet apart, using hand telephone sets with long wires attached to them which were snapped on to the line. While thus engaged a live wire carrying a current of 440 volts and 35 or 40 amperes came in contact with the signal wire, as a result of which Carr sustained an electric shock. He was thrown a distance of approximately ten feet and to the ground. A red ring appeared close to his left ear, and he suffered from a headache. He soon recovered, however, and resumed his work that night.

The decedent, it is claimed, also received a shock at the same instant. The evidence is that about six or seven minutes later McKay was seen sitting down in the signal shack, from which he had been telephoning to Carr, and rubbing his ear; that his handset was lying on the floor; that he said he had "got an awful jolt" (meaning "shock"); that he looked pale and unwell; that he sat there for about ten minutes before attempting to rise, and when he got to his feet he was "kind of wobbly" and appeared to be weak, and sat down again for about ten minutes. This was about three o'clock in the afternoon, the hour at which the decedent's shift ended. He was then relieved by a fellow workman, walked a distance of about one and a half to two miles to the bunkhouse, where he was observed by another of his fellow workmen to look unwell. About four o'clock he departed from the bunkhouse and started in his automobile, a model T Ford, for his home in Portland, a distance of forty miles.

When he had traveled approximately twenty-eight miles his car suddenly veered sharply to the left, crossed the road, left the pavement, and came to a stop

partly in the ditch on the opposite side of the highway. McKay was thrown out and received a head wound sufficiently grave to cause his death. The only witness to the accident was Oliver E. Hibbs, who, accompanied by his wife, was driving his automobile behind that of the decedent. Hibbs testified that he was proceeding towards Portland at a rate of speed between twenty-five and thirty miles an hour, and that there was a car ahead of him some 150 to 200 feet. It was a dark night and with a hard rain. Hibbs was watching the red light of the car ahead which he was overtaking. The road was level and straight. The car ahead was apparently being operated in a normal manner. He testified: "* * * The first I saw when I was down near the eleven mile road on a level street, it looks as if his car raised and turned completely over once and a half. It rolled to the left." When it came to rest the decedent's car faced back towards the highway on an angle. "It rolled clean over once, and rolled over on its side a second time. It was clear of the pavement." Hibbs got out of his car and saw the decedent lying perhaps twelve or fifteen feet from the Ford. He appeared to be in a very serious condition. The witness went for help, and when he returned to the scene of the accident McKay was dead.

It is the theory of the plaintiff that the cause of McKay's death was the electric shock which he had received earlier in the day. It is the defendant's contention that the proof was insufficient to establish that claim.

The evidence is ample to warrant the conclusion that McKay sustained an electric shock of greater or less severity. It is shown that the same current of electricity which caused Carr, who is conceded to have received a shock, to be thrown a distance of some ten feet,

would inevitably flow through the wire to the point at which McKay had connected his handset. The evidence is that McKay and Carr were telephoning to each other at the very instant of the contact between the signal wire and the high voltage wire. In order to hear each other it was necessary for them, on account of noise and atmospheric disturbances, to keep the earpiece of the handset close to the ear. McKay was standing on a concrete floor, but the concrete was wet, and there is ample evidence that a current of electricity carrying 440 volts would, under those circumstances, probably produce shock in a person using an instrument of the type that these men were using. The facts that the receiver on Carr's handset was burned while McKay's was undamaged, that Carr was working in the open while McKay was under cover, that McKay showed no physical signs of injury while Carr had a red spot near his left ear—these and other differences to which our attention is called by counsel are but circumstances going to the weight of the evidence, not to its sufficiency.

But we are of the opinion that the evidence fails to establish that the cause of McKay's death was electric shock. On the contrary, that question is left wholly in a state of uncertainty.

By expert testimony it is shown that the effect of electric shock on different individuals may vary greatly according to a number of factors. The individual himself may have greater or less resistance. The severity of the shock may be determined by the strength of the voltage and amperage of the current; the character of the ground connection, whether wet or dry; the season of the year; whether the day is clear or rainy; the length of time the victim is in contact with the current; the portion of the body and the extent of surface pre-

sented to the current; the pathway that the current takes through the body and its passage in close proximity to the heart; and perhaps other elements.

Low voltage current may be fatal to one man and leave another practically unscathed, and cases are of record of fatal shocks from 65 volts, while persons coming in contact with 50,000 volts or higher have survived.

Thus, it is entirely possible that McKay received an injury that could have caused death when he came in contact with the current of electricity of 440 volts.

It is also shown that death is not always instantaneous and that the victim of a fatal shock may survive as long as eight and a half hours. The current acts in various ways to cause death. It either stops the heart —heart fibrillation, explained as irregular and improper contraction of the heart muscle—or paralyzes the respiratory center in the brain, or destroys the tissues.

On the basis of this knowledge and the facts in evidence of the electric shock sustained by McKay and his subsequent conduct and death, two doctors testified on behalf of the plaintiff that in their opinion heart fibrillation, induced by electric shock, was the probable cause of his death. They said that he either died at the wheel or collapsed and so lost control of his automobile.

One of these witnesses was Dr. R. M. Erwin, county coroner of Multnomah county, who had, in his official capacity, certified that the decedent came to his death by a blow on the head. At first he testified that "to assume that the electrical shock produced his death at that particular time would be assuming considerable"; and again, when asked on cross-examination whether it was his testimony that the electric shock caused the

decedent to go off the highway, he said: "I can't say whether it did or did not. It would be merely an assumption. It is just as easy to assume one thing as it is another." Nevertheless he did venture the opinion that it was a "remote probability" that electric shock was the cause of McKay's death. The other medical expert called by the plaintiff was Dr. Urling C. Coe, who, apparently without hesitation, testified that McKay "probably had a heart failure right then and sunk over on the wheel and turned the car out. I think he was dead before he hit the pavement." When his attention was called to the fact that the evidence indicated that McKay was not dead until after he struck the pavement, he changed his opinion and said: "He might have been having a heart attack and slumped over on the wheel, he might have had muscular incoordination that caused him to pull out of the road, but he was evidently very sick from an electric shock."

It is also in evidence, and there is no dispute about this, that sometimes automobiles unaccountably leave the highway, with fatal results to the drivers. Thus, Dr. Erwin testified, possibly with some exaggeration, that: "My morgue is full of people every day that go off the highway without any apparent reason." Men of McKay's age, fifty-six, even though they seem to be in good health, are subject to be stricken with a cerebral hemorrhage or coronary thrombosis. Drivers of automobiles, it is well known, sometimes fall asleep at the wheel. Mechanical defects are occasionally the cause of such accidents, and the evidence that after the accident no flat tires were discovered and that apparently nothing was wrong with the steering gear of McKay's car does not exclude that possibility in this case. No one made more than a casual inspection of the vehicle. It was a model T Ford of the year 1926

or earlier. It was never afterwards driven, but was towed away from the scene of the accident and sold for junk.

■■ Without the testimony of medical experts as to the probable cause of death no one, we apprehend, would contend that any of the numerous possible causes presented could be seized upon as more likely than another. But, as we view it, the expert testimony does not make the case any stronger. We have recently held that the rule which forbids a jury to speculate on the cause of a death or injury applies also to the opinion evidence of medical experts: *Leona May Vale v. State Industrial Accident Commission*, 160 Or. 569, 86 P. (2d) 956. The testimony of Dr. Erwin and Dr. Coe that McKay's death was due to an injury to his heart has only one possible basis, and that is the fact that the man died. Without that there is no evidence whatever from which such an injury can be found, and the doctors did not claim that there is. All that could be definitely known about the decedent was that he had received an electric shock and that he died in an automobile accident a few hours later. But the cause of death was the question at issue, and in whatever form of language the experts might choose to clothe their opinions they necessarily arrived at them by assuming as a fact the very thing that was in dispute. In other words, they reasoned that because McKay sustained an electric shock he came to his death, and because he died the electric shock must have produced an injury to his heart capable of causing death or a collapse. This is not reasoning from cause to effect; it is reasoning in a circle.

We therefore agree with Dr. Erwin that to assume that electric shock was the cause of McKay's death is assuming a great deal, and that with respect to the

question whether electric shock caused his automobile to go off the highway, "it is just as easy to assume one thing as another."

Much has been said in argument about the rule of evidence that forbids predicating an inference on an inference. Counsel for the plaintiff urge that the doctrine should be re-examined and limited, and call our attention to the strictures pronounced upon it by Professor Wigmore and other authorities. See, 1 Wigmore On Evidence (2d Ed.), § 41; The Forum, Vol. X, 123, March, 1906; *Neely v. The Provident Life and Accident Insurance Company of Chattanooga*, 322 Pa. 417, 185 Atl. 784; *Madden v. The Great A. & P. Tea Co.*, 106 Pa. Super. 474, 162 Atl. 687.

Counsel for the defendant on the other hand would carry the rule to what seems to us to be unreasonable lengths, and have even suggested that a finding that the decedent in this case sustained an electric shock offends against the rule.

 In this state the doctrine that an inference may not be based on an inference is a creature of statute: § 9-804, Oregon Code 1930. It has been applied in a number of cases, among which may be mentioned: *State v. Hembree*, 54 Or. 463, 103 P. 1008; *Lintner v. Wiles*, 70 Or. 350, 141 P. 871; *Stamm v. Wood*, 86 Or. 174, 168 P. 69; *Deniff v. Charles R. McCormick & Co.*, 105 Or. 697, 210 P. 703; *Hayes v. Ogle*, 143 Or. 1, 21 P. (2d) 223. We will not extend this opinion unduly by analyzing these and like decisions, but we are confident that even the critics of the doctrine would not question the soundness of the results arrived at in these cases, although they might prefer a different *ratio decidendi*. The purpose of the rule is not to inhibit our inveterate reasoning processes; it is merely a means of testing logically the relevancy or sufficiency of evidence to

prove a fact in dispute. It does not forbid judgments based on circumstantial evidence, for, as Mr. Justice McBride said in *State v. Clark*, 99 Or. 629, 666, 196 P. 360:

"One fact may give rise to a single inference, or it may give rise to several inferences, or a logical conclusion may be drawn from a multitude of detached circumstances so related to each other and to the fact to be proved that it would be illogical to assume that they could all exist coincidentally and the fact in dispute be nonexistent."

■ On the other hand, it is not permitted to assume a fact that has not been legally proved and on such an insecure foundation to build a conclusion. And so it is said in *State v. Clark*, supra, in explaining the basis of the decision in *State v. Hembree*, supra:

"Each inference was a *non sequitur*, and had no foundation upon which to rest. This court refused to tolerate such a piling of inferences upon each other and pointed out that not even the principal fact upon which they were supposed to rest had been proved."

The instant case illustrates, in one aspect, an attempt to apply the rule improperly, and, in another aspect, its right application. The circumstances in evidence on which the plaintiff relies to prove that the decedent sustained an electric shock are "so related to each other that it would be illogical to assume that they could all exist coincidentally and the fact in dispute be nonexistent". But the conclusion that the decedent's death was caused by electric shock is based on the inference that the shock caused an injury to his heart capable of producing death. That, as this court said with reference to the evidence in the Hembree case, is a *non sequitur*. There is no evidence of injury to the decedent's heart. It is a mere possibility lacking proof,

and this possibility is necessarily the foundation of the plaintiff's claim, and so the case is exactly like *State v. Hembree,* supra, and the other cases decided by this court where evidence has been held insufficient or inadmissible because it consisted of inferences based on inferences.

It could as well be said that, as between two possible causes of decedent's death, no evidence has been produced which makes one cause appear as more probable than the other, or enables the triers of the facts to do other than guess at the solution of the mystery. In that situation the plaintiff necessarily must fail.

There being no evidence to support the verdict, the judgment based thereon is reversed and the cause is remanded with directions to enter judgment for the defendant.

RAND, C. J., and BAILEY and BELT, JJ., concur.