Argued March 7; affirmed March 28, 1944

# CHATFIELD *v.* ZELLER ET AL.

(147 P. (2d) 222)

Before Bailey, Chief Justice, and Belt, Kelly, Lusk and Hay, Associate Justices.

*Bert S. Gooding,* of Portland (Stott & Gooding, of Portland, on the brief), for appellant.

*E. U. Sims,* of Portland (F. H. Reeves, Sims & Sims and D. H. Palmer, all of Portland, on the brief), for respondent.

KELLY, J.

The plaintiff, C. L. Chatfield, was in the employ of defendant, A. R. Zeller, as a janitor. The principal part of the plaintiff's work for defendant was done on Fridays, but he was on call at other times. Defendant was the proprietor of an undertaking establishment. The building in which plaintiff was working, being a three story building, was equipped with an elevator or hoist operated by an electric motor. On Friday, April 17, 1942, while working for defendant as janitor, and thinking that the car of the elevator was in position for entry at the first floor, plaintiff opened the door thereto and attempted to turn the electric light switch therein preparatory to entering the car. In fact, the car was not at the first floor but above it. Plaintiff fell from the first floor to the pit of the elevator shaft and was injured.

This action originally was brought against A. R. Zeller and his son, Philip J. Zeller, but at the conclusion of plaintiff's case in chief, an order of voluntary nonsuit as to Philip J. Zeller was entered. For that reason, no references herein will be made to Philip J. Zeller as a defendant.

Defendant's first assignment of error is based upon the failure of the trial court to sustain defendant's objection to a question asked of Dr. Charles N. Holman, a physician employed in an administrative capacity as associate medical director of Multnomah County Hospital, to which plaintiff was transferred from Providence Hospital, and where he remained

from April 24, 1942, to July 23, 1942. Dr. Holman had in his hand while testifying the Multnomah County Hospital report; and he was asked: what treatment plaintiff was given at the Multnomah County Hospital and his answer was:

"He was treated for a fractured vertebra and was treated by being given complete bed rest."

Thereupon the following transpired:

"Mr. Gooding: We object to that. 'What he was treated for.' They can give the type of treatment.

"The Court: Yes, if he knows from the treatment what it was for, I think, he can testify.

"Mr. Sims: Q. You may state, if you know, what that treatment he received was for.

"A He was treated by being placed at bed rest—on boards—boards placed upon the mattress so it will be solid—hard—and his back would be unable to move, and he was kept on his back and abdomen so the spine would be fairly well immobilized, and give the lesions a chance to heal.

"Q As a physician, do you know what that treatment was for?

"A Yes, sir.

"Q What was it for?

"A What was it for?

"Q Yes.

"A For a fractured vertebra."

■ It will be noted that defendant through his counsel agreed that Dr. Holman might give the type of treatment, although upon this appeal recourse is had to the principle that an opinion of an expert must be based upon the record and not upon matter *aliunde* the record and it is urged that the Multnomah County Hospital report not having been received in evidence comprised no part of the record. Whatever the rul-

ing should have been as to the admissibility of the oral testimony, as to the type of treatment before the record thereof had been introduced, if seasonable objection had been made to such oral testimony, we think that in the absence of any such objection and because defendant through his counsel expressly consented to the giving of the oral testimony as to the type of treatment, no prejudicial error was committed by permitting Dr. Holman speaking from his own knowledge to testify as to the character of injury customarily given such treatment.

Moreover, upon re-cross examination, defendant's attorney asked the doctor the following question, which he answered as follows:

"Q This bed-rest that you spoke of a minute ago; isn't that a standard treatment for any back injury?

"A For many back injuries it is; for many of them."

In support of his first assignment of error defendant cites the following three cases:

*Frint v. Amato,* 131 Or. 631, 284 P. 183, *Vale v. State Industrial Accident Commission,* 160 Or. 569, 86 P. (2d) 956, and *McKay v. State Industrial Accident Commission,* 161 Or. 191, 87 P. (2d) 202.

The question of the admissibility of testimony is not presented in either of the foregoing cases. In the first named this court held that there was no evidence of permanency of damage. In the second and third it was held that the evidence was insufficient to sustain a finding that decedent's death was caused as claimed by plaintiff.

The second assignment of error is based upon the denial of defendant's motions for an order of non-

suit and for a directed verdict. Defendant's seventh assignment of error is based upon the failure of the trial court to instruct the jury to return a verdict for the defendant.

■ It is argued by defendant, in reference to these assignments of error that because the defendant, A. R. Zeller, was called by plaintiff as a witness, plaintiff is bound by his testimony.

The statute, however, prescribes "that when a party calls as a witness either an adverse party, or the assignor, agent, officer or employe of an adverse party, he shall not be deemed to have vouched for the credit of such witness and he may impeach the credit of such witness in the same manner as in the case of a witness produced by an adverse party." Sec. 4-709, O. C. L. A., Chap. 23, Oregon Laws 1937, p. 26.

It is also urged by defendant that a close analysis of the proof submitted by plaintiff will disclose that his employment or the kind of work he was employed to perform did not involve risk or danger.

This presents the question whether in a light most favorable to plaintiff, the testimony tends to support plaintiff's claim that as part of his duties as the employe of defendant he was called upon to enter the elevator or hoist, in the shaft of which he fell.

Plaintiff's testimony as to his duties covers three pages and hence it must be condensed. During the later years there was routine every Friday. On Fridays plaintiff would do the mopping, clean the rubber mats and the marquee, sweep the floors, sweep the sidewalk in front of the chapel, sweep and clean the long hall, then the short hall in front of the elevator and mop that, then to the work room where they dress

the caskets, then the elevators and that would be the routine. Plaintiff testified directly that he cleaned the elevator; that he would be in the elevator but not very often; that he was shown how to run the elevator by Mr. A. R. Zeller; that the only time he had help with the elevator was when he was taking caskets up; sometimes plaintiff would take people up to show them caskets. Plaintiff said in answer to one question whether cleaning the elevator was a part of his routine duty, that he didn't know how to answer that. At that point he used the following language: "On Friday's work there was nothing specified, but if I was ordered to clean it, I gave it a thorough cleaning, and after that, why, it was only desultory." It will be noted that this language could be interpreted as meaning when expressly ordered to clean the elevator, a thorough job of cleaning would be done, otherwise the cleaning of the elevator which plaintiff did was slight, hasty or loose. As to the frequency with which he was supposed to go into that elevator and do that cleaning, plaintiff said: "It was only when I would take the notion, maybe once a month or once in two or three months I would go in there and clean."

Construing plaintiff's testimony as we are required to do in considering motions for non-suit or directed verdict, that is, in a light most favorable to plaintiff, we think that no error was committed in overruling defendant's motions therefor.

In the motion of defendant for non-suit as presented to the trial court four grounds were assigned: (1) failure to show any violation of duty on the part of defendant; (2) proximate cause of accident shown to have been plaintiff's negligence; (3) no showing that it was the duty of defendant to warn plaintiff that

the elevator shaft was open, and not at the floor from which plaintiff attempted to enter and that it was an unguarded opening; (4) that the contract of employment did not contemplate any work by plaintiff that involved risk or danger.

The Employer's Liability Act enjoins upon the owner having charge of or responsible for, any work involving risk or danger to the employe or the public, the duty of using "every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity of preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices." Vol. 7, O. C. L. A., pp 596-597, Sec. 102-1601.

■ An elevator is within the term machinery as used in the Employer's Liability Act. *Thompson v. Union Fishermen's Co-op. P. Co.*, 118 Ore. 436, 448, 235 P. 694.

■ There is testimony in the record that there is a device which could be installed in defendant's elevator that would render the door incapable of being opened except when the car of the elevator was at the floor from which entry is sought to be made. In view of the testimony the jury were warranted in finding that the failure by defendant to have his elevator so equipped constituted a violation of his duty to his employes who were called upon to make use of such elevator.

As above outlined there is direct testimony that plaintiff was such an employe.

■ Contributory negligence is not a defense under the terms of the Employer's Liability Act, though it may be taken into account by the jury in fixing the damages. Sec. 102-1606, ibid.

■ Defendant's assignments of error numbered 3, 4 and 5, present the question whether there is any substantial testimony in the record supporting plaintiff's claim that he suffered a compression fracture of the anterior margin of the first and second lumbar vertebrae and the twelfth dorsal vertebra; and a disturbance of the bony portions of the spine.

X-ray pictures of plaintiff's spine were received in evidence without objection. Referring to Defendant's Exhibit B for identification, which is one of the x-ray pictures so received in evidence, Dr. Clarence W. Smith, a witness called by defendant, was questioned and testified as follows:

"Q Is there any evidence of fracture appearing in Defendant's Exhibit B for Identification?

"A There is no evidence of fracture. There is evidence of compression."

"Q By compression, D o c t o r, what do you mean?

"A Narrowing of the vertebrae itself.

"Q In other words, pressure from above and below, would that be it?

"A There is evidence, when I say that, of fracture at the same time, or compression fracture, as we call it, with a narrowing of the vertebrae.

"Q And where would you say that compression fracture is located with reference to the picture Defendant's Exhibit B for Ident.?

"A There is a narrowing of the twelfth dorsal and the first lumbar vertebrae."

In referring to one of the x-ray photos received in evidence as stated, Dr. Chas. N. Holman, a witness

called by plaintiff, was questioned and gave answers as follows:

"Q . Do you find any deformity at the conjunction of the first and second dorsal and lumbar vertebrae?

"A No; nothing, except the abnormality already mentioned; that the bodies of the first and second lumbar are somewhat compressed.

"Q What does that indicate?

"A A compression type of fracture."

It is true that the question whether the compression fracture sustained by plaintiff was of recent origin or due to a fall which plaintiff sustained several years ago is reflected in the testimony. Dr. Smith expressed the opinion that plaintiff's compression fracture was not of recent origin. We quote from Dr. Smith's testimony:

"Q Well, is your opinion the same as Dr. Ree's then, that there is a compression fracture there, or is it your opinion that the man simply has arthritic lipping that broke off at the time of this fall?

"A I agree with Dr. Rees, that there has been a compression fracture, but not of recent origin.

"Q Would you indicate on the x-ray there where there is a separation of arthritic lipping from the twelfth dorsal vertebrae, or the first or second lumbar vertebrae?

"A There is no evidence — the x-ray lots of times does not show, as most of your x-ray men will tell you, that you cannot always demonstrate a separation of arthritic lipping.

"Q You wouldn't want to testify, Doctor, that this man could not have sustained fracture in this area as of April 17, 1942, would you?

"A    That he would not have?

"Q    Yes.

"A    As far as I am concerned, I would say he didn't, according to the x-ray evidence, and also with Dr. Burton's records as shown at the County Hospital, as evidence, since we have compared them with the previous ones.

"Q    So your opinion you are giving us now is based, not upon your own examination and studies, but upon the x-ray reports that you have been given by at least two other radiologists, one Dr. Rees and the other some doctor at the County Hospital, is that right?

"A    No, not necessarily. I base my reports on this, what they personally have read to me, not on their reports of the comparison.

"Q    That is what I am getting at?

"A    That is right.

"Q    So that if you would disregard these reports received from radiologists and depend entirely upon your own manual examination, it would be your opinion, would it not, that this man did sustain traumatic injury to the back, either in the nature of a compression fracture, or of fracture of arthritic lipping in that area; is that right?

"A    I never heard the expression, fracture of arthritic lipping.

"Q    Well, breaking of it, anything you want to call it—separation of it then, if that is a nicer word. I am a lawyer, and not a doctor.

"A    That is true. But due to a recovery so fast, I would say that it is not a compression fracture.

"A    And that it is what?

"Q    More of a piece of arthritic lipping breaking off.

"Q    You are going to use the word "breaking" of arthritic lipping?

"A Separation of arthritic lipping.

"Q You couldn't fracture an arthritic lipping because it is not a bony growth; isn't that right?

"A No, it is a bony growth.

"Q Consequently we wouldn't call it a fracture, is that right?

"A You could in a sense, but we don't use it in that respect."

As shown from the foregoing excerpt of Dr. Smith's testimony, the record before us presents substantial testimony in support of plaintiff's claim that he suffered "a disturbance of the bony portions of the spine."

The only former injury sustained by plaintiff as shown by this record, was described by plaintiff thus:

"Q Do you recall before this date ever having been hurt? Was your back ever hurt?

"A Well, a little. I fell in Alaska in 1902.

"Q Tell us about that.

"A I was going on a casting schooner from Nome, Alaska, to Council City, and there was a storm—and the steamer was delayed, and the Captain said, 'If you are in such and such a place, I will find you,' and then word came we are ready to sail and I was in the warehouse and there was a chute there, where they shoot things down, and that lid should have been turned over, and the captain said 'Come on', he said 'We want to sail', and I stepped into the chute and I shot—

"Q Did you shoot down that chute?

"A I will say so. I didn't stop on the way, I'll say.

"Q Did you hurt your back?

"A It must have been hurt some. I was unconscious for a while. The ship was sailing when I came to.

"Q How long were you laid up?

"A I was not laid up at all. I went to work shoveling ore into cars back in Council City for the Wild Goose Mining Company."

According to the testimony before us, the fall into defendant's elevator shaft kept plaintiff in the hospitals from the 17th day of April until the 23rd day of July, 1942, a period of three months and six days. The fall through the chute in Alaska, 40 years before, was followed by an immediate recovery without any hospitalization. The jury, therefore, could have found that due to such a speedy recovery, the Alaska experience did not cause a compression fracture. Dr. Smith's testimony indicates that a recovery after more than three months' treatment in hospitals is too fast to support the conclusion that the malady was a compression fracture. Accepting that statement as a guide, certainly a recovery within a few hours or days at most would prove that the patient had not then sustained a compression fracture.

The presence of callous exudation is indicative of a recent fracture. The testimony upon that phase of the case is of a negative character—simply that the expert witnesses are unable to find the callous or to recognize it in the x-ray if they should see it.

We are unable to agree with defendant that there is no substantial testimony supporting the issues submitted to the jury by the trial court.

During the course of the Court's instruction to the Jury the Court instructed the Jury as follows (Tr. 160):

"In connection with the matter of the Employer's Liability Law, if your deliberations reach that point, you are instructed that the evidence in this

case introduced to show compliance with the law and regulations with respect to the operation of elevators does not necessarily, in and of itself, satisfy the requirements of the duty to use every device, care and precaution which it was practicable to use for the protection and safety of life and limb, limited only by the necessity of preserving the efficiency of the operation of the elevator involved in this case.''

To the giving of a portion of instruction, the defendant, A. R. Zeller duly saved an exception as follows (Tr. 167-8):

''Mr. Gooding: And we except to the instructions of the court on the Employer's Liability Act, in failing to define 'practicable' on the ground and for the reason there is no evidence to support the practicability of any device that could have been installed by the defendant Zeller which would have prevented the injury.

''The Court: Exception allowed.''

Excerpt from bill of exceptions.

Addressing ourselves to the reason assigned for taking the last above mentioned exception, namely that ''there is no evidence to support the practicability of any device that could have been installed by the defendant Zeller which would have prevented the injury'', we quote from the testimony of Mr. William Clifford Van Cott, who was then employed by the State of Oregon as an elevator inspector, who had been so employed for two years prior thereto and prior to that was in the employ of the State of Kansas for five years and for about seven months was in the employ of the Otis Elevator Company in Kansas City:

''Mr. Sims: * * * Are you acquainted with or familiar with the Zeller Funeral Parlor elevator and elevator shaft?

"A  I have inspected it about four times.

"Q  Directing my inquiry to that particular elevator, is there any device or equipment that is practicable to be used on this elevator door so that the door can not be opened except when it is at that level?

"A  Yes, sir.

"Q  Would a device of this type interfere with the normal use of the elevator?

"A  It would not.

"Q  How does this device work?  What is the principle?

"A  Well, there is what is known as an electrical inter locking device there, for an electric contact; that prevents the car moving if the door is open, and a mechanical lock which prevents the door to open if the elevator is not at that line.

"Q  Does this elevator, and by that, I mean the Zeller elevator, have an electric light in the shaft that could be operated from the hall, outside the elevator?  An electric switch in the hall by which you can turn it on in the elevator shaft?

"A  Not to my knowledge.

"Q  Would it be practicable to have such a light without interfering with the operation of the elevator?

"A  Yes.

"Q  Was there such a device, as you refer to, an inter-locking device, in that elevator at Zeller's?

"A  No."

Clearly the above quoted testimony of Mr. Van Cott refutes the statement that "there is no evidence to support the practicability of any device that could have been installed by defendant Zeller which would have prevented the injury."

■ No error was committed by giving the instruction last above quoted.

■ No request by defendant was presented to the trial court embodying a definition of the term, practicable. Indeed, the inherent clarity of that term is such as to render supererogatory any attempt further to clarify it.

Finding no reversible error, the judgment of the circuit court is affirmed.